1    EUGENE G. IREDALE, SBN 75292
2    JULIA YOO, SBN 231163
     GRACE JUN, SBN 287973
3    IREDALE & YOO, APC
     105 West F Street, Fourth Floor
4    San Diego, CA 92101-6036
     TEL: (619) 233-1525   FAX: (619) 233-3221
5

6                    UNITED STATES DISTRICT COURT
7              THE SOUTHERN DISTRICT OF CALIFORNIA

8    THE ESTATE OF RUBEN NUNEZ by      ) Case No. 16-CV-1412-BEN (MDD)
9    and through its successor-in-interest )
     LYDIA NUNEZ, ALBERT NUNEZ,        ) **SECOND  AMENDED**
10   and LYDIA NUNEZ,                   ) **COMPLAINT FOR:**
                                        )
11                Plaintiffs,           ) **(1)   Violation of Due Process (42**
                                        )       **U.S.C. §1983)**
12   v.                                 )
                                        ) **(2)   Deliberate Indifference to**
13   COUNTY OF SAN DIEGO, WILLIAM )           **Serious Medical Needs  (42**
     GORE in his individual capacity,  )       **U.S.C. §1983)**
14   BRUCE LEICHT, an individual,      )
     ALFRED JOSHUA, an individual,     ) **(3)   Wrongful Death (42 U.S.C.**
15   ROGEL TINGZON, an individual,     )       **§1983)**
     BIENVENIDO SAMONTE, an            )
16   individual, PAUL BELL, an individual, ) **(4)   Right of Association**
     CORRECTIONAL PHYSICIANS           )       **(42 U.S.C. §1983)**
17   MEDICAL GROUP, INC., a California )
     Corporation, SARA HANSEN, an      ) **(5)   Failure to Properly Train**
18   individual, JORGE NARANJO, an     )       **(42 U.S.C. §1983)**
     individual, STATE OF CALIFORNIA,  )
19   PATTON STATE HOSPITAL, HARRY )     **(6)   Failure to Properly Supervise**
     OREOL, an individual, KAYLA       )       **and Discipline (42 U.S.C.**
20   FISHER, an individual, MARCY      )       **§1983)**
     MOON, an individual, THERESA      )
21   BAROI, an individual, WILDA D.    ) **(7)   Failure to Properly Investigate**
     RAMOS, an individual, PERSON      )       **(42 U.S.C. §1983)**
22   BELIEVED TO BE NAMED              )
     NAPHTAL RUABWA, an individual,    ) **(8)   _Monell_  (42 U.S.C. §1983)**
23   and  DOES 6 - 50,                 )
                                        ) **(9)   Wrongful Death (CCP §**
24                Defendants.           )       **377.60)**
                                        )
25                                      ) **(10)  Negligence**
                                        )
26   _____ ) **(11)  Violation of 42 U.S.C. §12132**
                                        )
27                                      ) **(12)  Violation of 29 U.S.C. §794(a)**
                                        )
28                                      ) JURY TRIAL DEMANDED
                                        )

COME NOW, the ESTATE OF RUBEN NUNEZ by and through its successor-in-interest LYDIA NUNEZ, ALBERT NUNEZ, and LYDIA NUNEZ, by their attorneys of record, and allege and complain as follows:

# I.
## INTRODUCTION

At the time of his death, Ruben Nunez was 46 years old.  He had suffered from schizophrenia his entire adult life.  Off medication, Ruben became homeless in 2014.  He was arrested  for allegedly throwing a rock through a car window. Ruben was  committed to Patton, an inpatient state psychiatric hospital, after being found incompetent to stand trial in San Diego County Superior Court.  A Superior Court judge also ordered that he be involuntarily medicated.  At Patton, Ruben was diagnosed as having  psychogenic water intoxication, also known as psychogenic polydipsia.  Sufferers from this condition drink water uncontrollably, sometimes to the point of death.  Patton staff were well-aware of the potentially fatal consequence of polydipsia and knew that the failure to monitor and limit Ruben's water intake could have tragic consequences.

On August 5, 2015, Ruben Nunez was transferred to San Diego Central Jail from Patton to make a court appearance for a competency hearing.  When Patton State Hospital patients are transferred to jail  facilities, a discharge form is required to be sent to the other facilities listing the patient's diagnoses, medical risks and any special needs.  This form is required to be faxed ahead of the patient's arrival. As  a backup measure, a copy of the discharge form is included in the documents which travel with the patient.  For psychiatric patients who have a problem with polydipsia, there is an additional form which lays out a strict protocol for monitoring water intake and blood levels.  Patton faxed the discharge document to Central jail.  Patton failed to send the additional form containing the strict water intake protocol.  Patton failed to warn the Jail regarding the psychogenic nature of

1   Ruben's condition.

2   After Ruben was transferred to the Jail, he was seen by two psychologists,

3   Jorge Naranjo and Sara Hansen.  On August 6, 2015, Defendant Dr. Naranjo

4   reviewed and approved Ruben's medical chart from Patton.  Dr. Naranjo was aware

5   of Ruben's serious condition and the need to monitor his water intake but failed to

6   provide instruction to the jail staff regarding the need for monitoring.  Ruben's

7   medical records showed he had "a history of… hyponatremia" — a condition

8   caused by excessive water intake — "which required water restriction."  The staff

9   at the Central Jail did not limit or restrict his access to water.

10   On August 7, 2015, at 7:47 a.m., Defendant nurse Rogel Tingzon evaluated

11   Ruben.  Tingzon noted that Ruben was "well groomed, calm and cooperative, poor

12   eye contact, speech clear but only respond to questions asked."  Defendant Tingzon

13   had access to Ruben's medical records indicating hyponatremia.  Despite this

14   information, Defendant Tingzon noted in Ruben's chart:

15   "Informed I/P that he will seen [sic] by psych for f/u

16   Exercise as tolerated and **drink plenty of water**

17   **I/P verbalizes understanding and agrees to plan**."

18   (Emphasis added).

19   Defendant Tingzon was tasked with filling out a medical questionnaire for

20   Ruben.  The entire form was left blank with the exception of vital signs and a

21   notation "needs cxr denied use of exp drugs."  The rest of the seven page medical

22   form was left blank.

23   On August 9, 2015, Dr. Hansen conducted an evaluation of Ruben and wrote

24   in Ruben's medical chart, "hyponatremia require water restriction."  She had access

25   to the medical records which indicated that nurse Tingzon had told Ruben Nunez to

26   "drink plenty of water" and indicated that Ruben understood and agreed to the plan

27   to "drink plenty of water."  Dr. Hansen failed to take any further steps.

28

2

On August 13, during a security check, a deputy Paul Bell and nurse Benveniedo Samonte saw Ruben vomiting in his cell.  An investigator later noted in his report that the cell "smelled of urine and vomit." There was vomit in the sink, on a table, on the floor, on the cell's lower bunk and bloody vomit splattered on a wall. Defendant Samonte failed to alert medical staff and left Ruben in his cell with further access to water.  According to Samonte, he told Deputy Bell to bring Ruben down to the clinic for assessment.  No staff transferred Ruben to medical; watched Ruben; or cut off access to water.  Approximately one hour later, a deputy found Ruben on the floor of his cell.  Ruben had died of cerebral edema caused by excess consumption of water.  Ruben's clothing was soiled with vomit and urine.  There was vomit in Ruben's nasal cavity and on both of his hands.

The staff at the jail ignored the medical records in their possession which required monitoring of water intake.  Defendants left Ruben Nunez to die in his cell even after they saw that he had vomited and urinated on himself.

# I.
## GENERAL ALLEGATIONS

1. Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(3) and (4), et. seq.

2. Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3. At all times relevant to this complaint, decedent Ruben Nunez was an individual residing in San Diego County, California.

4. Lydia Nunez is the successor in interest of the Estate of Ruben Nunez. This action on behalf of the Estate of Ruben Nunez is brought through Mrs. Nunez, the mother of Ruben Nunez, as the successor-in-interest.

5. Lydia Nunez has filed a declaration with this Court that no proceeding

3

for the administration of the estate is pending and that she is the successor in interest under California law and succeeds to the decedent's interest.  There is no other person with a superior right to commence the action.

6.    Albert Nunez, Ruben's father, and Lydia Nunez bring an action in their own right for the loss of their son, Ruben.

7.    Plaintiffs Estate of Ruben Nunez and Lydia Nunez have properly complied with the Government Claim Act. Plaintiffs' claim was submitted to the California Government Claims Board on January 7, 2016.  Plaintiffs' claim was submitted to the County of San Diego on January 5, 2016.  Both the California Government Claims Board and County of San Diego acknowledged receipt of Plaintiffs' claims on January 11, 2016.  All claims were rejected.

8.    Plaintiffs provided notices of intent to sue under California's Code of Civil Procedure section 364, subdivision (a), part of MICRA to the following medical professionals on the following corresponding dates: Jorge Naranjo, December 12, 2016; Sara Hansen, December 12, 2016;  Steven H. Mannis (Agent of CPMG), December 12, 2016; Theresa Baroi, December 22, 2016; Harry Oreol, December 22, 2016; Marcy Moon, December 22, 2016; Kayla Fisher, December 22, 2016; Wilma D. Ramos, December 22, 2016; Bienvenido Samonte, January 30, 2017; Cloribel Desilva, February 1, 2017; and Rogel Tingzon, February 1, 2017.

9.    Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees and/or agents.

10.    Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. As Sheriff, Defendant Gore was responsible for the hiring, screening,

training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and Doe Defendants.

11.    At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department (hereinafter "Sheriff's") and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

12.    Defendant Gore is sued in his individual capacity for his own personal action or inaction.

13.    At all times relevant to this complaint, Defendant Bruce Leicht was the Medical Services Administrator.  Leicht developed and oversaw policies and procedures which affect both administrative activities as well as the care of patients in the County's detention facilities.

14.    At all times relevant to this complaint, Defendant Alfred Joshua was the Medical Director for the Sheriff's Department.  He supervised the medical staff and directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures.  All medical and psychiatric doctors worked under the direction of Joshua.

15.    At all times relevant to this complaint, all individual defendants and Does 6-30 were San Diego sheriff deputies or medical personnel and agents of Defendant County of San Diego.

16.    At all times relevant to this complaint, Does 31-40 were policy-making officials and supervisors at the San Diego County Sheriff's Department responsible for training, supervising, and disciplining jail deputies and medical staff at county jails and investigating allegations of misconduct by subordinates.

17.   San Diego Central Jail is owned and operated by County of San Diego and staffed by County of San Diego Sheriff's deputies.

18.   At all times relevant to this complaint, Defendant Correctional Physicians Medical Group, Inc. ("CPMG") was a corporation with its principal place of business located in San Diego, California. CPMG is a vendor of the County and provides, under written contract, psychiatric services to inmates incarcerated in County detention facilities.

19.   Jorge Naranjo, M.D. and Sara Hansen, M.D. are physicians residing and practicing psychiatry in the County of San Diego. Based on information and belief, Dr. Naranjo and Dr. Hansen were associated with CPMG, either as employees or independent contractors during the relevant time period. Dr. Naranjo and Dr. Hansen provided psychiatric services to inmates incarcerated in County detention facilities pursuant to CMPG's contract with the County.

20.   At all times relevant to this complaint, Defendant Harry Oreol was the Executive Director for Patton State Hospital.  Upon information and belief, Defendant Oreol developed and oversaw policies and procedures which affect both administrative activities as well as the care of patients in Patton Hospital, and oversaw the medical staff.

21.   At all times relevant to this complaint, Defendant Kayla Fisher was the Medial Director for Patton State Hospital.  Upon information and belief, Defendant Fisher developed and oversaw policies and procedures which affect both administrative activities as well as the care of patients in Patton Hospital, and oversaw the medical staff.

22.   At all times relevant to this complaint, Defendant Marcy Moon was the Hospital Administrator for Patton State Hospital.  Upon information and belief, Defendant Moon developed and oversaw policies and procedures which affect both administrative activities as well as the care of patients in Patton Hospital, and oversaw the medical staff.

23.    Upon information and belief, Oreol, Fisher and Moon were responsible for the policies of the hospital and oversaw the transfer of patients to jail facilities.

24.    At all times relevant to this complaint, Defendant Theresa Baroi was a nurse at Patton State Hospital who completed the discharge document sent to San Diego Central Jail.

25.    At all times relevant to this complaint, Defendant Wilma Ramos was a nurse tasked with completing the audit for accuracy when Ruben Nunez' discharge documents were drafted and sent to Central Jail.

26.    At all times relevant to this complaint,  an individual believed to be named "Naphtal Ruabwa" was a nurse tasked with checking the documents for completeness when Ruben Nunez' discharge documents were drafted and sent to Central Jail.  The name of the RN HSS is not printed and the signature appears to read "Naphtal Ruabwa" on the discharge document.

27.    At all times relevant to this complaint, Does 42-50 were  medical personnel of Patton State Hospital, working under the direction of Defendants Oreol, Fisher and Moon.

28.    Plaintiffs are truly ignorant of the true names and capacities of Does 6 through 50, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

29.    These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions of the other defendants thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

7

**II.**
**FACTS**

30.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

31.     In 2014, Ruben Nunez was committed to Patton State Hospital, a locked psychiatric facility, after being found incompetent to stand trial.

32.     Ruben had been diagnosed with schizophrenia.  A judge ordered that Ruben be involuntarily medicated.

33.     At Patton, Ruben was diagnosed with psychogenic water intoxication, also known as psychogenic polydipsia.  Sufferers from this condition drink water uncontrollably, sometimes to the point of death.

34.     Up to 20 percent of schizophrenic patients suffer from psychogenic polydipsia.

35.     At Patton, Ruben was required to be monitored under water intoxication protocol.  Ruben did not have access to water in his room.  He was weighed by a nurse before each meal.

36.     On August 5, 2015, Ruben Nunez was transferred to San Diego Central Jail from Patton to make a court appearance to determine whether Ruben should continue to be involuntarily administered pyschotropic medication.

37.     When state hospital patients are transferred from Patton to other facilities, a discharge form is required to be sent to the other facilities listing the patient's diagnoses, medical risks and any special needs.  This form is required to be faxed ahead of the patient's arrival, and as a backup measure, a copy of the discharge form is included in the documents which travel with the patient.

38.     The discharge document was generated and checked by Defendants Baroi, Ramos and Doe 41.  It was sent to San Diego Central Jail.

39.     The discharge document referenced among other conditions, "water intoxication = weight adjustment."

40.     For psychiatric patients who have a problem with polydipsia, there is an additional form that lays out a strict protocol for monitoring water intake and blood levels.

41.     No such form was generated by any of the responsible officials at Patton Hospital for Ruben.

42.     Upon information and belief, Patton defendants did not provide sufficient information regarding the psychogenic nature of Ruben's polydipsia or the potentially fatal consequences of failing to properly monitor Ruben's water intake.

43.     Patton Defendants were well-aware of the potentially fatal consequence of polydipsia and knew that the failure to monitor and limit Ruben's water intake could have tragic consequences.

44.     Defendants were specifically made aware of the dangers of polydipsia because a patient suffering from polydipsia in a California state hospital had died from water consumption  before this incident.

45.     Despite their awareness of Ruben's psychiatric condition, Patton discharged Ruben to San Diego County Central Jail with a single document noting only "water intoxication weight adjustment." In violation of its own policies, Patton Defendants failed to notify the Central Jail that Ruben suffered from polydipsia.

46.     The documentation Patton provided lacked a reference to "polydipsia" the compulsive condition, which is one (but not the only) cause of hyponatremia (water intoxication); it lacked as well a specific and critically important specification of the treatment required for polydipsia, a cause of hyponatremia, a potentially fatal condition.

47.     After Ruben was transferred to the Jail, he was seen by two doctors , Jorge Naranjo and Sara Hansen.

48.     On August 6, 2015, Defendant Dr. Naranjo reviewed and approved Ruben's medical chart from Patton.  Dr. Naranjo was aware of Ruben's hyponatremia and the need to monitor his water intake but failed to provide instruction to the jail staff regarding the need for monitoring.

49.     The staff at the Central Jail did not limit or restrict his access to water.

50.     On August 7, 2015, at 7:47 a.m., Defendant nurse Rogel Tingzon evaluated Ruben.  Tingzon noted that Ruben was "well groomed, calm and cooperative, poor eye contact, speech clear but only respond to questions asked."

51.      Defendant Tingzon had access to Ruben's medical records indicating hyponatremia.  Despite this information, Defendant Tingzon noted in Ruben's chart:

> "Informed I/P that he will seen [sic] by psych for f/u
> Exercise as tolerated and **drink plenty of water**
> **I/P verbalizes understanding and agrees to plan**."
> (Emphasis added).

52.     Defendant Tingzon was tasked with filling out a medical questionnaire for Ruben.  The entire form was left blank with the exception of vital signs and a notation "needs cxr denied use of exp drugs."  The rest of the seven page medical form was left blank.

53.     On August 9, 2015, Dr. Hansen conducted an evaluation of Ruben and noted in her chart of Ruben's "hyponatremia require water restriction."

54.     Dr. Hansen had access to the medical records generated by nurse Tingzon which indicated that Tingzon had told Ruben Nunez to "drink plenty of water" and which indicated that Ruben understood and agreed to the plan to "drink plenty of water."

55.     Dr. Hansen failed to take any further steps. Dr. Hansen gave no further instructions regarding Ruben's hyponatremia.

56.     On August 13, during medical rounds, Defendant Deputy Paul Bell and nurse Benveniedo Samonte saw Ruben vomiting in his cell.  Bell and Samonte

stood outside the cell, watching Ruben vomit.  No one went inside the cell to check on Ruben.

57.    An investigator for the Medical Examiner's Office later noted in his report that the cell "smelled of urine and vomit." There was vomit in the sink, on a table, on the floor, on the cell's lower bunk and bloody vomit splattered on a wall.

58.    Defendant Samonte failed to alert medical staff and left Ruben in his cell with further access to water.

59.    According to Samonte, he told Deputy Bell to bring Ruben down to the clinic for assessment.

60.    The medical and jail staff left Ruben in an unsanitary condition in his own vomit and urine.

61.    Samonte and Bell did not transfer Ruben to Medical;  did not monitor Ruben; and did not cut off Ruben's access to water.

62.    Approximately one hour later, a deputy found Ruben on the floor of his cell, not breathing.

63.    Ruben died of cerebral edema caused by excess consumption of water.

64.    Ruben's clothing was soiled with vomit and urine.  The Medical Examiner found that there was vomit in Ruben's nasal cavity and dried vomit on both hands.

65.    Jail deputies and medical staff had access to information regarding inmates' medical condition through a computerized system and through the medical charts.

66.    The jail medical staff, including Doe Defendants and Drs. Naranjo and Hansen, did know that Ruben Nunez suffered from hyponatremia, which was documented in his medical chart.

67.    In hyponatremia, which is also known as water intoxication, one or more factors — ranging from an underlying medical condition to drinking too

much water during endurance sports — causes the sodium in a human body to become diluted.

68.   All medical staff worked under the direction and supervision of Defendants Leicht and Joshua, who set the policies and procedures with respect to medical services.

69.   There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

70.   There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct and deaths in the Jail.

71.   Deaths of 60 inmates in the San Diego County jails in a span of five years prompted a series of articles by Citybeat, a local newspaper.  Citybeat reported that  San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012.

72.   Citybeat reported that between 2007 and 2012, San Diego County averaged 10 deaths a year, with a high of 12 in 2009 and a low of eight in both 2007 and 2012.

73.   Citybeat reported in a follow-up article that twelve people died in 2013.  In 2014, sixteen county-jail inmates died.

74.   San Diego County officials, including Defendant Gore, were aware of the systemic problems with preventable deaths in the jails, but took no action to prevent further Constitutional violations.

75.   At the time of Ruben Nunez's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

76.   Defendant Joshua was well aware of these problems when he became the director.  Joshua told reporters that staff would be trained to be more attentive

to signs that might indicate mental distress, like the condition of an inmate's cell or whether someone was refusing meals.

77.     Defendants were aware of the following examples of failure to coordinate and share critical medical information among personnel, and other widespread problems at the San Diego County jails:

78.     Inmates Jeff Dewall in 2008 and Tommy Tucker in 2009 died at the hands of jail deputies due to oxygen deprivation when guards attempted to restrain them.  In the case of Tommy Tucker (who suffered from serious psychiatric conditions), deputies who were involved in the use of force sat together in the supervisor's office at the Central Jail and discussed what happened before writing a report.   The deputy statements were inconsistent with the video of the event and the physical evidence.  Upon information and belief, none of the deputies were reprimanded.  The County Law Enforcement Review Board ("CLERB") did not investigate Tommy Tucker's death.

79.     Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug-related.  They were either overdoses or physical complications due to withdrawal.  Richard Diaz, a 40-year-old addict, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal.

80.     In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."

81.     In response to CLERB, Earl Goldstein, who at the time was the Sheriff's medical director, rejected the recommendation, saying that the jail's suicide rate was low—only four suicides total during the 2007-2008 and 2008-2009 fiscal years (July 1, 2007, through June 30, 2009).  There were actually six suicides during that period.  Goldstein wrote: "Based on... the low incidences of

1  completed suicides in our facilities, it is not practical to add these systems to the
2  current program."

3       82.    In a March 2011 letter to the sheriff, the Citizens Law Enforcement
4  Review Board (CLERB) expressed concern that the department did not have formal
5  policies regarding when it would alert CLERB of an inmate's death, despite the
6  County Code's endowing the board with clear oversight responsibilities. Per state
7  law, CLERB is allowed one year to initiate an investigation. There were cases in
8  2009 and 2010 that the Board didn't find out about in time in order to timely begin
9  an investigation. CLERB identified five areas in which  it wanted to be included in
10 the notification process; the Sheriff declined all of them.

11      83.    "We strive to respond with professionalism and a spirit of cooperation
12 to recommendations for improvement to the policies and procedures," Sheriff's
13 Department Executive Manager John Madigan wrote in response. "CLERB has
14 significantly contributed to the enhancement [of ] these important documents and
15 we appreciate the Board's insight."  But, he concluded: "After due consideration,
16 Sheriff Gore respectfully declines to modify the policies and procedures as
17 suggested by CLERB."

18      84.    On June 25, 2011, Daniel Sisson died from an acute asthma attack
19 made worse by drug withdrawal. The San Diego County Medical Examiner
20 estimated in an autopsy report that Sisson had been dead for several hours when a
21 fellow inmate found him.  The jail staff had failed to monitor him despite his
22 exhibiting signs of withdrawal and his  vomiting in his cell.

23      85.    In September 2012, Bernard Victorianne suffered for five days from
24 drug overdose because the staff ignored his medical information that he had
25 ingested a baggie of methamphetamine and that he was to return to the hospital
26 immediately if he became symptomatic of overdose.  Bernard Victorianne was
27 placed in segregation instead of Medical, where he was found dead face-down,
28 naked in his cell.

86.     In 2014, Hector Lleras told jail staff that he was suicidal.  He was placed in a safety cell for a day.  Twenty-four hours afer he was released from a safety cell, he hanged himself.

87.     In 2014, Christopher Carroll, who was mentally ill, was placed in segregation.  He was found dead with a noose around his neck.  Mr. Carroll had smeared blood on the wall of his cell.  He had urinated on the floor and food and feces were stuck to the ceiling.

88.     These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, dishonesty and improprieties will be tolerated by the Department, even when a death results.

89.     Ruben Nunez was a disabled individual suffering from a mental impairment that substantially limited one or more major life activities.  Ruben Nunez was a "qualified individual with a disability" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

90.     The County of San Diego and Patton Hospital are "public entities" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

91.     It was well documented that Ruben Nunez was diagnosed with schizophrenia and he was unable to care for himself.

92.     Defendants denied Ruben Nunez benefits of the services, programs or activities of the San Diego County Jail and Patton Hospital because of his disability and subjected him to discrimination.

**FIRST CAUSE OF ACTION**
**(Violation of Due Process (42 U.S.C. §1983))**
**[By the Estate of Ruben Nunez  Against Samonte, Bell, and Does 1-40]**

93.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

94.    Incarcerated persons are entitled to confinement under humane conditions which provide for their basic human needs. A prison has a duty to provide adequate sanitation and hygienic materials.

95.    Defendants Samonte and Bell saw Ruben in his cell in his own vomit and urine.  Ruben needed help with his basic medical and sanitary needs.

96.    Defendant Bell returned to Ruben's cell for security cell check and looked through the window.  Bell did not summon help.

97.    Defendants Samonte and Bell ignored Ruben's needs by failing to take him to a clean and safe environment; failing to take him to medical or psychiatric observation unit; and failing to observe Ruben.

98.    Defendants Samonte and Bell left Ruben in serous adverse conditions, gravely ill and in filthy conditions.

99.     Defendants Samonte and Bell deprived the Ruben of a minimal civilized measure of life's necessities.

100.   Defendants Samonte and Bell were deliberately indifferent when they consciously disregarded the condition they observed.

## SECOND  CAUSE OF ACTION
### (Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983))
**[By the Estate of Ruben Nunez  Against Leicht, Joshua, Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa",Tingzon, Naranjo, Hansen, Samonte, Bell and Does 6-50]**

101.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

102.   Defendants violated Ruben Nunez's Fourteenth Amendment right to medical care.

103.   Defendants knew that Ruben Nunez faced a serious medical and mental health need.

104.   Patton Defendants knew that Ruben Nunez suffered from polydipsia, a potentially life threatening illness.

16

105.   The jail medical staff knew that Ruben suffered from hyponatremia, which required monitoring and limiting water intake.

106.   Defendants were deliberately indifferent to a known and serious medical need, which they knew could be fatal.

107.   Defendants failed to properly communicate to other medical and security staff the necessary medical information so that Ruben's water intake could be controlled.

108.   Defendants Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", and Does 42-50 failed to provide necessary medical documentation and information to San Diego Central Jail regarding Ruben's serious medical need.

109.   Patton medical staff had diagnosed Ruben with psychogenic water intoxication, also known as psychogenic polydipsia.

110.   Patton has specific policies and procedures to transfer or discharge a patient to other facilities. Patton requires an additional form that details a strict protocol for monitoring water intake and blood levels for patients who have been diagnosed with polydipsia.

111.   Even though Ruben had been diagnosed with schizophrenia and polydipsia, Patton Defendants failed to follow their own procedures.

112.   Only the single document was sent to San Diego County Jail for Ruben's transfer.  No one followed up with the Jail to communicate the urgency of the need to monitor Ruben's water intake.

113.   Defendants Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", and Does 42-50 knew that the Central Jail would rely on their expertise, recommendations and diagnosis because Ruben was a Patton Hospital patient.  Defendants failed to properly communicate critical medical information, including treatment and prevention, regarding a potentially life threatening illness.

114.   On August 5, 2015, Patton discharged Ruben with a single document

notating "water intoxication weight adjustment."

115.   Defendants Baroi, Ramos, and Person Believed to be "Naphtal Ruabwa",  were in charge of Ruben's discharge.  Defendant Theresa Baroi was the nurse at Patton who oversaw the discharge of Ruben. Defendant Wilda Ramos was the nurse in charge of the audit for Ruben's discharge document. Person Believed to be "Naphtal Ruabwa" was to ensure that the discharge form was complete.

116.   Defendant Ramos was tasked to complete the audit for accuracy before it was ultimately sent to San Diego County Jail.  Person Believed to be "Naphtal Ruabwa", Baroi and Ramos failed to properly communicate the serious nature of Ruben's psychogenic polydipsia, the proper protocol for treatment, and the need to limit Ruben's water intake.

117.   On August 6, 2015, Defendant Dr. Naranjo reviewed and approved Ruben's medical chart from Patton.  Dr. Naranjo was aware of Ruben's serious condition, hyponatremia, and the need to monitor his water intake.  Dr. Naranjo failed to provide instruction to the jail staff regarding the need for monitoring.

118.   On August 7, 2015, at 7:47 a.m., Defendant nurse Rogel Tingzon evaluated Ruben.  Tingzon noted that Ruben was "well groomed, calm and cooperative, poor eye contact, speech clear but only respond to questions asked."

119.   Defendant Tingzon had access to Ruben's medical records indicating hyponatremia.  Despite this information, Defendant Tingzon noted in Ruben's chart:

> "Informed I/P that he will seen [sic] by psych for f/u
> Exercise as tolerated and **drink plenty of water**
> **I/P verbalizes understanding and agrees to plan**."
> (Emphasis added).

120.   Defendant Tingzon failed to properly document Ruben's medical records, leaving nearly the entire seven page form blank.

121.   On August 9, 2015, Dr. Hansen conducted an evaluation of Ruben. Dr. Hansen knew that Ruben suffered from hyponatremia. She failed to take any steps

to provide medical and psychiatric care even though she had access to the medical records generated by nurse Tingzon with the instruction, "drink plenty of water."

122.   On August 13, during a security check, a deputy Paul Bell and nurse Benveniedo Samonte saw Ruben vomiting in his cell.

123.   Defendant Samonte failed to alert medical staff and left Ruben in his cell with further access to water.

124.   According to Samonte, he told Deputy Bell to bring Ruben down to the clinic for assessment.

125.   Bell conducted a cell check, but failed to check on Ruben's welfare.

126.   Samonte and Bell did not transfer Ruben to Medical;  did not monitor Ruben; and did not cut off Ruben's access to water.

127.   Samonte and Bell failed to provide adequate observation, necessary evaluation and treatment to Ruben Nunez, and failed to ensure necessary hospital-level treatment despite his obvious medical need.

128.   Samonte and Bell knew that Ruben Nunez's condition was serious and that he was in significant pain and distress and that failure to treat his condition could result in further significant injury and unnecessary and wanton infliction of pain.

129.   Samonte and Bell were deliberately indifferent to Ruben Nunez's serious medical need, which caused harm to the decedent.

130.   Approximately one hour later, a deputy found Ruben on the floor of his cell, not breathing.

131.   Defendants Leicht and Joshua were deliberately indifferent to Ruben Nunez's serious medical need by failing to properly set forth policies and procedures for proper care of inmates in medical distress.

132.   Leicht and Joshua knew that a significant number of inmates booked in Central Jail suffered from serious mental health conditions.

19

133.   Defendants Leicht and Joshua knew that the policies they had implemented with respect to medical care of inmates suffering from mental health conditions were grossly inadequate.  Defendants Leicht and Joshua were aware of the disproportionately high number of deaths in San Diego County Jails.

134.   Defendants Leicht and Joshua knew that the jail staff were failing to read the patients' medical charts or that they were ignoring the information contained in the medical records.  Defendants Leicht and Joshua were deliberately indifferent in failing to implement policies and providing oversight to ensure that their subordinates were complying with the constitutional requirements in treating patient/inmates.

135.   Defendants Leicht and Joshua acted with deliberate indifference in failing to implement policies with respect to evaluation and treatment of inmates suffering from mental health conditions.

136.   Defendants Tingzon, Samonte, Hansen, Naranjo and Does 6-40  acted under the direction and supervision of Defendants Leicht and Joshua who set forth the standards, policies and procedures on treatment of inmates, including Ruben Nunez.

137.   Pursuant to the policies and procedures set by Defendants Leicht and Joshua, Ruben Nunez received no medical care despite obvious signs that he was suffering from hyponatremia.

138.   By failing to set forth procedures on proper care of inmates, including mandates that inmates who suffer from hyponatremia be observed in Medical; that they be monitored regularly by a medical doctor; that the inmate be transported to a hospital when exhibiting obvious signs of hyponatremia, Leicht and Joshua were deliberately indifferent to Ruben Nunez's serious medical need.

139.   As a direct and proximate result of all Defendants' deliberate indifference to Ruben's serious medical need, Ruben Nunez experienced physical

pain, severe emotional distress, and mental anguish for days, as well as loss of his life and other damages alleged herein.

140.   The conduct alleged herein caused Ruben Nunez to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Ruben Nunez to suffer emotional distress, pain and suffering and further damages according to proof at the time of trial.

141.   The conduct alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

**THIRD CAUSE OF ACTION**
**(Wrongful Death (42 U.S.C. §1983))**
**[By the Estate of Ruben Nunez against  Oreol, Fisher, Moon, Baroi, Ramos,**
**Person Believed to be "Naphtal Ruabwa", Tingzon, Naranjo, Hansen,**
**Samonte, Bell and Does 1-50]**

142.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

143.   Defendants committed wrongful acts which proximately caused the death of Ruben Nunez.

144.   Defendants  Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", and Does 42-50 failed to properly communicate the serious nature of psychogenic polydipsia, the proper protocol for treatment, and the need to limit Ruben's water intake. They failed to communicate that access to water could kill Ruben.  They failed to warn that Ruben may have an uncontrollable urge to drink water to the point of death.

145.   Defendant Tingzon told Ruben to "drink plenty of water" and Ruben agreed to do so.

146.   Dr. Naranjo and Dr. Hansen, being aware of Ruben's hyponatremia, failed to implement any measures to monitor Ruben or provide him with pyschiatric care.  Dr. Hansen was aware that nurse Tingzon had told Ruben to drink plenty of water, but took no action.

147.   Defendants Samonte, Bell and Does 6-40 saw Ruben Nunez in medical distress but failed to render aid or transport him to the hospital, leaving him to die in his jail cell.

148.   Defendants deprived Ruben Nunez of his rights under the United States Constitution to be free from cruel and unusual punishment and punishment without due process.

149.   These wrongful acts were done with a deliberate indifference to the safety and welfare of Ruben Nunez.

150.   The conduct alleged herein violated Ruben Nunez's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiff to suffer emotional distress, pain and suffering, and further general and special damages according to proof at the time of trial.

### FOURTH CAUSE OF ACTION
### (Right of Association (42 U.S.C. §1983) )
**[By Plaintiffs Albert Nunez  and Lydia Nunez against  Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", Tingzon, Naranjo, Hansen, Samonte, Bell  Does 6-50]**

151.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

152.    Defendants deprived Ruben Nunez of his rights under the United States Constitution to be free from cruel and unusual punishment; denial of medical care; and denial of due process.

153.   The aforementioned acts and/or omissions of Defendants in being

deliberatively indifferent to  serious medical needs, health and safety; and violating Ruben Nunez's civil rights; caused the untimely and wrongful death of Ruben Nunez, deprived Plaintiffs Albert and Lydia Nunez of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

154.   There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in obvious medical distress and leaving him unattended, vomiting all over his cell with deliberate indifference.  Defendants' actions shock the conscience.

155.   The deprivation of the rights alleged above has destroyed the Constitutional rights of Ruben's  parents, Albert and Lydia Nunez, to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment.

156.   The conduct alleged herein violated Ruben Nunez's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer emotional distress, pain and suffering, and further damages according to proof at the time of trial.

**FIFTH CAUSE OF ACTION**
**(Failure to Properly Train (42 U.S.C. §1983))**
**[By the Estate of Ruben Nunez against Oreol, Fisher, Moon, the County of San Diego, Gore, Leicht, Joshua, CPMG, and Supervisory Doe Defendants 31-50]**

157.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

158.   Defendants Does, Oreol, Fisher, and Moon failed to properly train defendants Baroi, Ramos, and Does in the performance of their duties in drafting critical medical discharge documents for patients who suffer from conditions that could be fatal.

23

159.   Given a prior death involving the death of a patient at a state hospital from psychogenic polydipsia, Defendants Does, Oreol, Fisher and Moon were aware of the danger of failing to notify the jails of this condition and failing to warn the jails regarding the fatal consequences of water overdose.

160.   Defendants Does, Oreol, Fisher and Moon failed to properly train their employees with regard to the need to communicate critical medical information to jails that would house their patients.

161.   Officials of the San Diego Sheriffs Department, acting under color of law, have subjected decedent Ruben Nunez and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

162.   Defendants Gore, Joshua, Leicht and Does 31-40 have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates; to prevent the consistent and systematic failure to provide medical care.

163.   There has been an official policy of acquiescence in the wrongful conduct.  Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

164.   Gore, Joshua and Leicht failed to train medical and psychiatric doctors and nurses on the necessary care of inmates suffering from serious medical conditions including hyponatremia, and they failed to implement policies and procedures with respect to proper training.

165.   Gore, Joshua and Leicht failed to train medical and psychiatric doctors and nurses on documenting and reading critical information on medical charts to ensure continuity of care.

166.   Defendants County of San Diego, Does 31-40, and Gore, with deliberate indifference, disregarded a duty to protect the public from official misconduct.

167.   Despite their knowledge of previous instances of wrongful deaths in the jails, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

168.   Defendant CPMG failed to train Dr. Naranjo and Dr. Hansen on the necessary care of inmates suffering from serious medical conditions including hyponatremia,

169.   The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Ruben Nunez and others in his position.

170.   As a result, decedent Ruben Nunez suffered physical and psychological injuries and death.

171.    As a direct consequence of the failure of Does, CPMG, Oreol, Fisher, Moon, County of San Diego, Does, Joshua, Leicht and Gore to properly train their officers and medical staff, Ruben Nunez suffered unconstitutional treatment and inhumane conditions during his detention.

172.   As a result of the Defendants' historical failure to properly train, Defendants were deliberately indifferent to the needs of Plaintiff.

### SIXTH CAUSE OF ACTION
**(Failure to Properly Supervise and Discipline (42 U.S.C. §1983))**
**[By the Estate of Ruben Nunez against Oreol, Fisher, Moon, the County of San Diego, Gore, Joshua, Leicht, CPMG, and Supervisory Doe Defendants 31-40]**

173.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

174.   Defendants Oreol, Fisher, and Moon failed to properly supervise and discipline defendants Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", and Does in the performance of their duties in drafting critical medical discharge documents for patients who suffer from conditions that could be fatal.

25

175.   Defendants Oreol, Fisher and Moon failed to properly supervise their employees with regard to the need to communicate critical medical information to jails that would house their patients.

176.   As a result of the Defendants' historical failure to properly supervise and discipline their employees, Defendants Person Believed to be "Naphtal Ruabwa", Baroi and Ramos were deliberately indifferent to the serious medical needs of Plaintiff.

177.   Defendant CPMG failed to properly supervise Drs. Naranjo and Hansen with regard to the need to communicate critical medical information and the need to provide adequate care.  As a result, Drs. Naranjo and Hansen were deliberately indifferent to the serious medical needs of Plaintiff.

178.   Defendants County of San Diego, Does, Joshua, Leicht and Gore failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

179.   Defendants County of San Diego, Does, Joshua, Leicht and Gore failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by deputies and medical staff.

180.   Defendants County of San Diego, Does and Gore have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

181.   Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails and failed to properly supervise and discipline their employees or agents.

182.   Defendants County of San Diego, Does and Gore refused to investigate misconduct and/or took no remedial steps or action against deputies and medical staff.

183.   Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them.

184.   There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

185.   Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

186.   Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

187.   As a result of the Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff.   The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

**SEVENTH CAUSE OF ACTION**
**(Failure to Properly Investigate (42 U.S.C. §1983))**
**[By the Estate of Ruben Nunez against the County of San Diego, Gore, Joshua, Leicht, and Supervisory Doe Defendants 31-40]**

188.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

189.   Defendant County of San Diego maintained a longstanding pattern of failing to properly investigate misconduct.

27

190.   Upon information and belief, Defendants maintained a *de facto* policy of not obtaining accurate and timely reports from witnesses and staff alleged to have been involved in misconduct or witnessed misconduct.

191.   Upon information and belief, Defendants maintained a *de facto* policy of allowing homicide investigators to intimidate witnesses; to ask leading questions, suggesting the answers; and to summarize the interviews of inmates in their investigation files that distort the actual recorded statements of witnesses.

192.   Upon information and belief, Defendants gave families of inmates limited information regarding the deaths of their loved ones, on one occasion, waiting 1 ½ years to provide information on how an inmate died.  In another case, the family found out the facts of their son's death from reading reports of CLERB made publicly available.

193.   Defendants County of San Diego, Gore, Joshua, Leicht, and Supervisory Doe Defendants 31-40 historically and systematically engaged in a pattern of failure to properly investigate misconduct of deputies and medical staff.

194.    The longstanding pattern of failing to properly investigate staff misconduct led to the actions or inactions of the deputies and medical staff who denied medical care to Ruben Nunez.  Defendants' pattern of failing to investigate created a culture of unconstitutional acts and acts that violate the Jail's own policies and procedures.

195.   Defendant Gore was personally aware of these failures but took no action to prevent harm to inmates, including Ruben Nunez.

196.   Defendants Joshua and Leicht failed to properly investigate the misconduct of the medical staff despite a history of medical neglect and preventable deaths in the San Diego jails.

197.    The individual defendants in this case knew that their actions would not be investigated and that they would not be disciplined for their actions.

198.   The systemic failures by all defendants to properly investigate led to the misconduct of the deputies and medical staff in this case.

199.   As a result of all Defendants' historical failure to properly investigate, Defendants were deliberately indifferent to the needs of Plaintiff Ruben Nunez. The failure to investigate was the moving force behind the denial of medical care, and cruel and unusual punishment on the decedent Ruben Nunez and the resulting pain and suffering and death.

### EIGHTH CAUSE OF ACTION
*(Monell* **Municipal Liability Civil Rights Action (42 U.S.C. §1983))**
**[By all Plaintiffs Against Defendant County of San Diego]**

200.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

201.   Defendant County of San Diego maintained an unconstitutional policy, ordinance or regulation which allowed their deputies and medical staff to deny medical care to inmates.

202.   There were longstanding and systemic deficiencies in San Diego jails' treatment to inmates.  Deficiencies included improper cell checks, inadequate medical staffing, lack of required training on screening, diagnosis and treatment of medical and psychiatric conditions, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

203.   Defendants failed to set forth any policies or conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness or another disability.

204.   County's failure to train its deputies and medical staff on treatment of inmates in medical distress gives inference of a municipal custom that authorized or condoned deputy misconduct.

205.   Upon information and belief, the permanent, widespread, well-settled practice or custom of Defendant was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward when inmates are in need of medical care.

206.   There was a custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care.

207.   There was a custom and practice of not properly screening inmates for medical care or treatment.

208.   There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies.

209.    There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious physical or psychiatric needs.

210.   There was a custom and practice of failing to conduct proper cell checks as required by County's own written policies.

211.   There was a custom and practice of not properly investigating misconduct of deputies and medical staff.

212.   There was a custom and practice of falsifying information during investigations of misconduct and misleading the investigations by the independent citizens' review board.

213.   Defendant County of San Diego was deliberately indifferent to the widespread unconstitutional acts by its staff and failed to set forth appropriate policies regarding the treatment of inmates.

214.   During the relevant period, all Defendant deputies, medical staff, and Does 1 through 40, were acting pursuant to the policy of Defendant County of San Diego.

215.   Death of 60 inmates in the San Diego County jails in a span of five years prompted a series of articles by a local newspaper.  Citybeat reported that

San Diego County had the highest mortality rate among California largest jail systems based on data from 2007 to 2012.  This rate continued through 2013 and 2014.

216.   This pattern of tragic deaths supports an inference that Defendants are promoting and maintaining a culture of deliberate indifference to human life at the Jail.

217.   Defendant County of San Diego was deliberately indifferent to the right of the plaintiff and others to be free from, and protected from, harm by the misconduct of it employees.

218.   The Sheriff Department's longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates.

219.   As a direct result of the practice or custom of the County of San Diego, Defendants, including Does1-40 denied medical care, denied transportation to the hospital, failed to place Ruben Nunez in a medical wing, and left him sick and vomiting to die.

220.   The unlawful and illegal conduct of Defendant deprived Ruben Nunez of the rights, privileges and immunities secured to him by the Constitutions of the United States.

221.   Defendant maintained a *de facto* policy of permitting unconstitutional and lawless conduct by its' employees.

222.    As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

**NINTH CAUSE OF ACTION**
**Wrongful Death – CCP 377.60, et seq.**
**[By Plaintiffs Estate of Ruben Nunez and Lydia Nunez against Oreol, Fisher, Moon Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", Leicht, Joshua,  Tingzon, Naranjo, Hansen, Samonte, Bell, County of San Diego, Doe Defendants 6-50]**

223.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

224.   Defendants committed wrongful acts which proximately caused the death of Ruben Nunez.  Specifically, Defendants deprived Ruben Nunez of his rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment.

225.   Defendants denied Ruben Nunez access to necessary medical attention; failed to communicate critical medical information; failed to transport him to the hospital; failed to cut off his water intake; and left him in his own vomit and urine in his cell.

226.   Patton Defendants' decision to deviate from their own protocol as to the discharge policies of psychiatric patients was a substantial factor in causing Ruben's death.  It was reasonably foreseeable that failure to notify the Jail of a fatal condition of polydipsia would lead to the lack of treatment.

227.   Defendant Tingzon failed to document any of Ruben's serious medical conditions and told Ruben to drink plenty of water.  Defendants Naranjo and Hansen had access to Nunez's medical records, knew Nunez suffered from hyponatremia, and failed to communicate to other jail staff to monitor and restrict Nunez's water intake.  Samonte, and Bell witnessed Ruben Nunez in medical distress and failed to take any life-saving measures.

228.   These acts resulted in the death of Ruben Nunez.

229.   The County of San Diego,  is responsible for the act of individual and Doe Defendants under the theory of *respondeat superior*.

230.   The wrongful acts alleged above has destroyed the relationship between Plaintiffs and Ruben Nunez and has legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

# TENTH CAUSE OF ACTION
## Negligence
**[By Plaintiffs Estate of Ruben Nunez and Lydia Nunez against Defendants Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", Tingzon, Naranjo, Hansen, Samonte, Bell, CPMG, County of San Diego, Gore, Leicht, Joshua and Does 6 - 50]**

231.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

232.   Defendants had a duty to Plaintiff  to act with ordinary care and prudence so as not to cause harm or injury to another.

233.   In evaluating, assessing and handling Nunez's medical condition, Defendants Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", Tingzon, Naranjo, Hansen, and Samonte  failed to comply with professional and legal standards.

234.   Defendants Oreol, Fisher, Moon, Baroi, Ramos, Person Believed to be "Naphtal Ruabwa", and Does 42-50 improperly, negligently, wrongfully, and recklessly failed to provide necessary medical documentation and information to San Diego Central Jail regarding Ruben's serious medical need.

235.   Tingzon, Naranjo, Hansen, and Samonte improperly, negligently, wrongfully, and recklessly failed properly document Ruben's serious medical and psychiatric condition; failed to communicate to the other jail staff regarding the need to monitor Ruben's water consumption; and failed to provide any medical care for a life-threatening condition.

236.   Tingzon, Naranjo, Hansen, Samonte, and Bell improperly, negligently, wrongfully, and recklessly failed to take any action to monitor Ruben Nunez despite his obvious symptoms of a serious illness.

237.   Defendants Samonte, and Bell improperly, negligently, wrongfully, and recklessly failed to render medical care to Ruben Nunez who was in physical pain and in obvious physical distress.

238.   Defendants Samonte, Bell and Does 6-40 improperly, negligently, wrongfully, and recklessly failed to take any action to summon help or transport Ruben Nunez to the hospital despite notations in the medical record regarding symptoms of polydipsya.

239.   Defendants Gore, Leicht and Joshua improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding medical treatment of inmates suffering from schizophrenia and/or polydipsya.

240.   Defendants Gore, Leicht and Joshua improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding proper screening, evaluation,  treatment, and transportation of inmates suffering from a serious medical condition.

241.   Defendants Gore, Leicht and Joshua improperly, negligently, wrongfully, and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness or another disability.

242.   Defendants Oreol, Fisher and Moon improperly, negligently, wrongfully, and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle protocols for patients who suffer from psychogenic polydipsia.

243.   By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Ruben Nunez.

244.   The County of San Diego is responsible for the act of individual and Doe Defendants under the theory of *respondeat superior*.

245.   CPMG is responsible for the act of Defendants Naranjo and Hansen under the theory of *respondeat superior*.

246.   Plaintiffs are informed and believe that Defendants County of San Diego, Gore, Joshua, Leicht, and Does 6-40 maintained policies, practices and procedures that allowed for and encouraged the denial of care which ultimately caused the death of Ruben Nunez.  These policies, practices and procedures include without limitation Defendants' training procedures and practices with respect to supervision of the officers and policies and procedures with regard to providing necessary medical attention.

247.   By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to plaintiffs.

248.   As a direct and proximate result of the Defendants' negligent conduct as herein described, Ruben Nunez suffered physically and mentally in the amount to be determined at the time of trial.

249.   As a further proximate result of the Defendants' negligent conduct, Ruben Nunez died.

250.   As a further proximate result of the Defendants' negligent conduct, Plaintiffs Albert and Lydia Nunez have lost their son and suffered great emotional and mental harm in the amount to be determined at the time of trial.

251.   The conduct of the Defendants  also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 *et seq*. and punitive damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

**ELEVENTH CAUSE OF ACTION**
**Violation of the Americans With Disability Act of 1990**
**42 U.S.C. 12101, et seq.**
**[By the Estate of Ruben Nunez against State of California, Patton State Hospital and County of San Diego]**

252.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

253.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

254.   Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.  The ADA sets an affirmative requirement to act appropriately with respect to prisoners with mental disabilities.

255.   ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

256.   Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

257.   Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental health. These accommodations include specialized training of jail staff, heightened level of medical care, and diligent surveillance.

258.   Defendant State of California and Patton State Hospital failed to make reasonable accommodations to Ruben Nunez's medical needs based on his mental health.  Patton Hospital employees failed to communicate the protocol for treatment of polydipsia despite their knowledge that Ruben suffered from a potentially fatal condition.

259.   Patton Hospital denied Ruben Nunez benefits of the services, programs or activities including a safe transfer to a County Jail, which is the services, programs or activities they provide.  The failure to provide critical medical information was a denial of the services program or activity based on his disability.

260.   Defendant San Diego failed to make reasonable accommodations to Ruben Nunez's medical needs based on his mental health.  Defendants failed to provide any treatment for Ruben's hyponatremia.  Defendants ignored Ruben Nunez's signs of obvious medical distress and left him in his cell with access to water.

261.   Defendant San Diego failed to make reasonable accommodations to Ruben Nunez's need to be placed in a cell without access to water.

262.   Defendants failed to provide Ruben with any access to mental health programs and services and failed to accommodate his mental disabilities.

263.   Instead of cutting off access to water and engaging in water intoxication protocols, Defendant Tingzon told Ruben to drink plenty of water.

264.   There was an outright denial of services when Ruben was exhibiting obvious symptoms of medical distress.  This demonstrates that Defendants were discriminating against Ruben Nunez because of his disability.

265.   Defendants were deliberately indifferent to Ruben Nunez's serious medical condition.  Defendants had actual knowledge of the substantial risk of harm to Ruben Nunez from his serious diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to take reasonable steps to limit Ruben's water intake; failing to place him in Medical where he could be watched; and failing to provide him medical care when Ruben was in medical distress.

266.   The regulations promulgated by the Department of Justice to implement Part A of Title II of the ADA require each government entity to conduct a self-evaluation of its programs and services (or the lack thereof) related to persons with disabilities:

> (a) A public entity shall, within one year of the effective date of this part [that is, by January 26, 1993], evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of

any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments

267.   County of San Diego failed to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability.

268.   State of California and Patton State Hospital failed to conduct any self-evaluation of procedures and training for its personnel about how to handle communication with jails regarding potentially fatal conditions such as polydipsia.

269.    The Estate of Ruben Nunez is entitled to a declaratory judgment concerning State of California, Patton State Hospital and County of San Diego's failure to conduct a self-evaluation plan under the Rehabilitation Act and the Americans with Disabilities Act and injunctive relief, requiring it to modify its programs and services to accommodate persons with disabilities.

270.   Defendants violated Ruben Nunez's clearly established rights under the ADA with deliberate indifference.

271.   The violation of Ruben Nunez's rights resulted from a municipal policy or custom adopted or maintained with deliberate indifference.

272.   As a direct and proximate result of the Defendants' conduct as herein described, Ruben Nunez suffered in the amount to be determined at the time of trial.

273.   Plaintiff is entitled to injunctive and declarative relief.

**TWELVTH CAUSE OF ACTION**
**Violation of the Rehabilitation Act 29 U.S.C. 794(a)**
**[By the Estate of Ruben Nunez against State of California, Patton State Hospital and County of San Diego]**

38

274.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

275.   The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States  . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

276.   Defendants State of California, Patton State Hospital and  County of San Diego are programs that receive federal financial assistance as defined in 29 U.S.C. § 794(b).

277.   Ruben Nunez was a "qualified individual with a disability" under the Rehabilitation Act.

278.   Defendants violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Ruben Nunez, a disabled person.

279.   Defendants were deliberately indifferent to Ruben Nunez's serious medical condition.

280.   Defendants State of California and Patton State Hospital failed to communicate critical medical information to San Diego Central Jail.

281.   Instead of providing Ruben Nunez with adequate medical services and fair treatment, Defendants refused to provide him with medical and psychiatric care as his condition deteriorated and Ruben was dying of water intoxication.

282.   Defendants had actual knowledge of the substantial risk of harm to Ruben Nunez from his serious, diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to take reasonable steps to limit Ruben's water intake; failing to place him in Medical where he could be watched; and failing to provide him medical care when Ruben was in medical distress.

39

283.   Defendants State of California, and Patton State Hospital violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle communications with jails regarding patients who have mental illness or another disability, including polydipsia.

284.   Defendant County of San Diego violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability.

285.   As a direct and proximate result of the Defendants' conduct as herein described, Ruben Nunez suffered in the amount to be determined at the time of trial.

286.   Plaintiff is entitled to injunctive and declarative relief.

WHEREFORE, Plaintiffs pray as follows:

1.     For general and special damages according to proof at the time of trial;

2.     For attorneys' fees and costs of suit and interest incurred herein;

3.     For punitive damages;

4.     Injunctive and declaratory relief; and

5.     Any other relief this court deems just and proper.

DATED:   February 14, 2017          Respectfully submitted,


                                     /s/ *Julia Yoo*
                                     JULIA YOO
                                     Attorney for Plaintiffs