EXHIBIT 306

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF RUBEN NUNEZ, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF SAN DIEGO, et al., <br><br> Defendants. | <br><br><br><br><br><br> Case No. 16-CV-1412-BEN (MDD) |
| COUNTY OF SAN DIEGO, et al., <br><br> Cross-Claimants, <br><br> vs. <br><br> CORRECTIONAL PHYSICIANS MEDICAL GROUP, INC., et al., <br><br> Third-Party Defendants. | |

VIDEO DEPOSITION OF ROGEL NOTARTE TINGZON, RN
San Diego, California
May 16, 2017
Reported by Gina Marie De Luca, CSR No. 6973, RMR, CRR

1  orientation in doing medical intake, after that, how
2  often would you yourself, then, do medical intake as a
3  nurse?
4      A.   Be perhaps once or twice a week.
5      Q.   And would that be true, once or twice a week
6  you would do medical intake, in the year 2015 as well?
7      A.   Yes.
8      Q.   Now, as a medical intake nurse, have you ever
9  done medical intake for prisoners who have transferred
10 from Patton State Hospital?
11     A.   Yes.
12     Q.   And in that regard, are you familiar with
13 what's called a "discharge summary"?
14     A.   Yes.
15     Q.   Tell me what a discharge summary is.
16     A.   A discharge summary is a medical record that
17 came from -- or it comes from a medical -- another
18 medical facility such as a hospital, clinic, or
19 pharmacy.  So they -- they -- they often bring that to
20 us.
21     Q.   And what is the purpose of a medical discharge
22 summary as you understand it?
23     A.   For continuance of care.
24     Q.   Continuity of care?
25     A.   Yes.

```
1      Q.   To make sure that the patient has the same
2  treatment so that he will be or she will be properly
3  treated.
4           MR. KISH:  Objection; assumes facts, incomplete
5  hyp- -- incomplete hypothetical.
6  BY MR. IREDALE:
7      Q.   Correct?
8           Ms. Tingzon, the purpose for continuity of care
9  is to make sure that the person gets the proper care?
10          MR. KISH:  Same objections.
11          THE WITNESS:  Yes.
12 BY MR. IREDALE:
13     Q.   Now, as the intake nurse, what information from
14 the nursing discharge summary are you supposed to
15 include in the JIMS computer?
16          MR. KISH:  Objection; assumes facts.
17 BY MR. IREDALE:
18     Q.   You may answer.
19     A.   The medication and the orders from the doctor.
20     Q.   And any other information other than medication
21 and orders from the doctor that you were trained to put
22 into the JIMS system from a nursing discharge summary?
23     A.   Pretty much -- yeah, just the medication.
24     Q.   If there was any medical condition that
25 required an alert, was that supposed to be something
```

1    A.    Okay. So the discharge summary, especially
2 from Patton --
3    Q.    Yes.
4    A.    -- or other psychiatric institutions -- the
5 intake nurse norma- -- typically makes a copy of those.
6 So the original goes to the PSU, and the -- the copy
7 itself goes to the medical screening.
8    Q.    So, in other words, when you did the medical
9 screening, you had a copy of the nursing discharge
10 summary?
11   A.    Yes.
12   Q.    Now, let me talk to you about that.
13         You -- you were the person who checked his
14 vital signs? Were you the person who checked his vital
15 signs as shown here on the medical question form?
16   A.    On this one, yes.
17   Q.    Yes.
18         Did you do that examination?
19   A.    Yes.
20   Q.    And so you took his temperature and his blood
21 pressure; is that true?
22   A.    Yes.
23   Q.    His weight you reflect as 175.
24   A.    Correct.
25   Q.    Is there a scale there so that you weigh the

```
 1      Q.   Let me, if I could, show you Exhibit 19 and ask
 2   if you recognize it as being the nursing discharge
 3   summary which you had on the day you did the medical
 4   screening for Mr. Nunez from Patton State Hospital.
 5           MR. KISH:  Make sure you look at all the
 6   documents.  He's asking about all the exhibit.
 7   BY MR. IREDALE:
 8      Q.   Is that a copy of the document that you had
 9   from Patton on the day you did the screening?
10      A.   Yes.
11      Q.   And now let me go to the other questions that
12   you ask and the answers that are recorded.
13           The second question is "Do you have any
14   previous mental health history?"
15           Do you see that?
16      A.   Yes.
17      Q.   And the answer is reflected as being "No."
18           Did the patient tell you "No" when you asked if
19   he had previous mental health history?
20      A.   I don't remember.
21      Q.   All right.  Do you know where you got that
22   answer, "No," that you put in the left-hand column
23   there?
24      A.   I'm sorry, but I cannot remember if -- because
25   it was too long, I cannot remember.
```

1    A.    Yes.

2    Q.    "Induration" -- or "10-millimeter induration"
3  means the size of the swelling that took place?

4    A.    Yes.

5    Q.    "Water intox." What does "water intox" mean?

6    A.    Sorry, but I don't remember.

7    Q.    At the time when you saw this document, did you
8  look where it said "Alerts" and read that?

9    A.    Can you elaborate, please.

10   Q.    Yes.

11         When you review the medical discharge summary
12  from Patton --

13   A.    Yes.

14   Q.    And you've seen these discharge summaries from
15  Patton in the course of your work in the past?

16   A.    Yes.

17   Q.    And the form itself, that is to say, the
18  printed material, is standard; right?

19   A.    Yes.

20   Q.    And my question is where it says "Alerts" --
21  you understand that where it says "Alerts," that's
22  referring you to a medical issue or a medical problem
23  that the institution -- in this case, the jail -- should
24  be aware of?

25         MR. KISH:  Objection; assumes facts, compound.

```
 1   BY MR. IREDALE:
 2        Q.   Your answer?
 3        A.   No, I don't -- I don't remember seeing that
 4   "Alerts."
 5        Q.   You -- do you know -- well, let me just ask
 6   you.  You don't remember seeing the "Alerts" on this
 7   document?
 8        A.   Yes.
 9        Q.   And you don't remember reading "water intox"?
10        A.   No.
11        Q.   And you don't know what "water intoxication"
12   means?
13        A.   I don't remember.
14        Q.   Did you know it at the time?  Did you know the
15   meaning of "water intoxication" in August of 2015?
16        A.   No, I don't remember.
17        Q.   Did you ask anybody, "What is 'water
18   intoxication'?"
19        A.   No, I don't remember.
20        Q.   Do you have access to your cell phone in your
21   job?
22        A.   In medical screening, they don't have any
23   Wi-Fi.  So I don't have any access.
24        Q.   All right.  Did you do anything to look up the
25   meaning of the word "water intoxication"?
```

```
 1              MR. IREDALE:  It's all right.  It's of no great
 2   moment.  Let's -- let's pass on it.
 3   BY MR. IREDALE:
 4        Q.   Could I refer you to page 2 of 3 of that
 5   document, where it says "2 of 3" at the bottom.
 6        A.   Yes.
 7        Q.   There is a part of this form that talks about
 8   Current Medical Problems/Focus of Treatment.
 9             Do you see that?
10        A.   Oh, right.  It does, yes.
11        Q.   Do you know what "Current Medical
12   Problems/Focus of Treatment" means?
13        A.   It says the current treatment.
14        Q.   Yes.
15             And "current medical problem" -- what does that
16   mean to you?
17        A.   Their medical problem.
18        Q.   Yes.
19             And do you see where it says "6.3 Water
20   Intoxication = Weight Adjustment"?  Do you see that?
21        A.   Yes, I can see it.
22        Q.   Did you read that on the 7th of August when you
23   did the medical screening?
24        A.   No, I don't remember seeing that.
25        Q.   Where it says "Significant Medical History" --
```

```
 1   you see, at the bottom of that, it says "Other" and, on
 2   the Comment portion, "water intox."
 3              Do you see that?
 4       A.    Yes, sir.
 5       Q.    Did you review that and see that water intox
 6   was listed that second time on this page?
 7       A.    Can you please elaborate.
 8       Q.    Yes.
 9              Do you see where it says "water intox" on the
10   form?
11       A.    This one?
12       Q.    Yes, ma'am.
13       A.    I saw the paper, but I don't remember seeing
14   the --
15       Q.    You don't remember seeing "water intox"?
16       A.    Yes.
17       Q.    And at least as of now, you don't know what
18   "water intoxication" is?
19              MR. KISH:  Objection; asked and answered.
20   BY MR. IREDALE:
21       Q.    Is that right?
22       A.    I don't remember.
23       Q.    Okay.  And then let me refer you to a third
24   part of this document.
25              You see where it says "Special Precaution
```

Page 49

```
 1   (Specify)" at the bottom of the page?
 2       A.   Yes.
 3       Q.   Tell me what your understanding of the meaning
 4   "special precaution" is.
 5       A.   Precaution.  Precautionary measure.
 6            THE REPORTER:  Precaution -- I'm sorry?
 7            THE WITNESS:  Precautionary measure about
 8   the -- about the treatment for the patient.
 9   BY MR. IREDALE:
10       Q.   In other words, this is something you need to
11   be aware of and take as a precaution to avoid a serious
12   problem?
13       A.   Yes.
14            MR. KISH:  Objection.
15   BY MR. IREDALE:
16       Q.   Yes?
17            MR. KISH:  Objection; misstates testimony,
18   assumes facts, incomplete hypothetical.
19   BY MR. IREDALE:
20       Q.   And your answer "yes"?
21       A.   Yes.
22       Q.   And where it says "Special Precaution," you see
23   it says "Latent TB"?
24       A.   Yes.
25       Q.   And you also see where it says "water intox"
```

1  there?

2     A.  Yes, I can see it right here.

3     Q.  All right. And after -- did you read it?
4  Where it said "Special Precaution: water intox," did
5  you read that?

6     A.  As I said, I got the paper, but I didn't -- I
7  don't remember seeing the -- the --

8     Q.  Water intox?

9     A.  -- intoxicated.

10    Q.  All right. Let's go, if we could, to page 3 of
11 3.

12        Have you ever heard the term "polydipsia"?

13    A.  Yes.

14    Q.  Tell me what "polydipsia" means.

15    A.  A person has the tendency to drink.

16    Q.  To drink water?

17    A.  Water.

18    Q.  And that they drink so much water that it can
19 be even fatal to them?

20    A.  Yes.

21    Q.  When did you learn what polydipsia was?

22    A.  In nursing school.

23    Q.  Tell me what you learned in nursing school
24 about polydipsia.

25    A.  Can you please elaborate.

```
1   BY MR. IREDALE:
2       Q.   Tell me what "hyponatremia" is.
3       A.   That means that sodium level is low than the
4   average.
5       Q.   And the normal sodium level is what?
6       A.   It ranges between 135 and to 145.
7       Q.   And so if it's below 135, it would be
8   considered low?
9       A.   Yes, sir.
10      Q.   Now, may I refer you to page 3 of 3.
11           And do you see where it says "Nursing Treatment
12  Summary" there?
13      A.   Oh. Yes.
14      Q.   Let me, if I could, just refer you to the last
15  three lines.
16           You see it says "Minimal participates with his
17  treatment. Remain with watwe," w-a-t-w-e,
18  "intoxication. Weight four times a day before meals.
19  Remain within protocol limits. Sodium level is 141
20  millimoles per liter on 7/14/15."
21           First, did I read properly what is there on the
22  form?
23      A.   Yes, I believe.
24      Q.   Did you read that when you did the medical
25  screening on August the 7th of 2015 for Mr. Nunez?
```

```
 1   is written: "Instructions Given to." And then there is
 2   a mark beside "Patient." And then it says "documents
 3   faxed to receiving facility and copies provided to
 4   California Department of Correction and Rehabilitation
 5   escorting officer. Receiving facility to follow up
 6   treatments, medications recommendation as stated, and
 7   the facility needs to follow up with their own
 8   Court-Ordered Meds for patient."
 9            Did I read properly from that?
10       A.  Yes.
11       Q.  And so you understood that the receiving
12   facility was to follow up treatments, medication, and
13   recommendation as stated?
14            MR. KISH:  Objection; assumes facts.
15   BY MR. IREDALE:
16       Q.  Is that true?
17       A.  If it state right there --
18       Q.  Yes.
19       A.  -- yes.
20       Q.  And then it says "If there are any questions or
21   concerns, call Patton State Hospital at (909) 425-7000";
22   correct?
23       A.  Yes.
24       Q.  Did you call Patton State Hospital in
25   connection with any questions regarding this form that
```

```
 1   we have before you?
 2       A.   No, I didn't.
 3       Q.   Have you ever, in the course of your work as a
 4   nurse at the jail, called to Patton State Hospital with
 5   any questions regarding the treatment of a patient from
 6   Patton?
 7       A.   I have not.
 8       Q.   May I refer you to the next page.  It says at
 9   the top "DSH Monthly Psychiatric Progress Note."
10            Under "Subjective complaints, Psychiatric
11   Symptoms and Interval History," which is in the middle
12   of the page, it reads, in the last two lines, "Mr. Nunez
13   remains on a Water Intox Protocol and is weighed by a
14   nurse before each meal."
15            Do you see that?
16       A.   Oh.  Yeah, yeah.
17       Q.   Do you see that?
18       A.   Yes, I can see it.
19       Q.   Did you know what a water intox protocol was?
20       A.   No, I don't.
21       Q.   And did you ask anybody on that date, the 7th
22   of August, what a water intoxication protocol was?
23       A.   I don't remember.
24       Q.   It says "is weighed by a nurse before each
25   meal."
```

1   Q.   "Informed inmate/patient that he will be seen
2   by psych for follow up"?
3   A.   Yes.
4   Q.   "Exercise as tolerated and drink plenty of
5   water."
6        Is that what you told the patient?
7   A.   Yes. On my charting, it says.
8   Q.   And so he then told you he understood, and he
9   agreed to the plan?
10  A.   Yes. I --
11  Q.   Yes.
12       And did he tell you that he would exercise and
13  that he would drink plenty of water?
14  A.   I don't remember if he --
15  Q.   When you studied polydipsia in nursing school,
16  you understood that it was a serious medical condition?
17       MR. KISH: Objection; vague.
18  BY MR. IREDALE:
19  Q.   Yes?
20  A.   I don't -- can you please elaborate.
21  Q.   Yes.
22       You understood that people who have polydipsia
23  and drink to excess can die?
24  A.   Yes.
25  Q.   And that's a serious medical condition?

```
1            I, Rogel Notarte Tingzon, RN, do hereby declare
2    under penalty of perjury under the laws of the State of
3    California that I have read the foregoing transcript;
4    that I have made such corrections as noted herein, in
5    ink, initialed by me, or attached hereto; that my
6    testimony as contained herein, as corrected, is true and
7    correct.
8            Executed this _____ day of _____, _____,
9    at _____, _____.
10
11                                 _____
12                                 Rogel Notarte Tingzon, RN
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              : : :   CERTIFICATE OF REPORTER   : : :
 2
 3              I, GINA DE LUCA, a Certified Shorthand
        Reporter, holding a valid and current license issued by
 4      the State of California, CSR No. 6973, duly authorized
        to administer oaths, do hereby certify:
 5              That the witness in the foregoing deposition
        was administered an oath to testify to the whole truth
 6      in the within-entitled cause;
                That said deposition was taken down by me in
 7      shorthand at the time and place therein stated and
        thereafter transcribed into typewriting, by computer,
 8      under my direction and supervision.
 9              ( X )   Reading and signing was requested.
10              (   )   Reading and signing was waived.
11              (   )   Reading and signing was not requested.
12              Should the signature of the witness not be
        affixed to the deposition, the witness shall not have
13      availed himself/herself of the opportunity to sign or
        the signature has been waived.
14              I further certify that I am neither counsel for
        nor related to any party in the foregoing depositions
15      and caption named nor in any way interested in the
        outcome thereof.
16
17
18      Dated:  This 29th day of May 2017
19              at San Diego, California.
20
21
22              _____
23                  Gina Marie De Luca
24                  CSR No. 6973, RMR, CRR
25
```

Imagine Reporting 619.888.0297