FILED

NOV 0 5 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ⟋⟍⟋⟋⟋ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF RUBEN NUNEZ by
and through its successor-in-interest
LYDIA NUNEZ, ALBERT NUNEZ, and
LYDIA NUNEZ,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al,

Defendants.

Case No.: 3:16-cv-01412-BEN-MDD

**ORDER**
**[Docs. 268, 273, 274, 275, 280, 291]**

Plaintiffs Estate of Ruben Nunez, Lydia Nunez, and Albert Nunez bring twelve civil claims against Defendants Patton State Hospital ("the Hospital"), the State of California, Correctional Physicians Medical Group, Inc. ("CPMG"), and numerous individual state and county employees. Plaintiffs' claims allege violations of Mr. Nunez's civil rights and rights under the Americans with Disabilities Act and Rehabilitation Act, as well as their rights under California state law. Plaintiffs seek damages for Defendants' alleged violations of Mr. Nunez's constitutional rights, which Plaintiffs contend caused Mr. Nunez's death.

Although the parties jointly dismissed numerous defendants throughout the course of litigation, many defendants still remain, all of whom filed motions for summary

1

judgment, Docs. 268, 273, 274, and 275. Additionally, Plaintiffs filed a motion for partial summary judgment on Counts 11 and 12, Doc. 280, as well as an ex parte motion to exclude, Doc. 291. For the following reasons, Defendants' motions for summary judgment, Docs. 268, 273, 274, and 275, are **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' motion for partial summary judgment, Doc. 280, is **DENIED**; and Plaintiffs' ex parte motion to exclude, Doc. 291, is **DENIED**.

# I. BACKGROUND

## A. Procedural Background

In their Second Amended Complaint, Plaintiffs bring 12 claims, two of which they voluntarily dismissed.[1] The following claims are at issue in the parties' pending motions for summary judgment:

- **Count 2** – Violation of the Fourteenth Amendment Right to Medical Care under § 1983 (against Oreol, Fisher, Baroi, Ramos, Rucibwa, Naranjo, and Hansen)
- **Count 4** – Right of Association under § 1983 (against Oreol, Fisher, Baroi, Ramos, Rucibwa, Naranjo, and Hansen)
- **Count 5** – Failure to Properly Train under § 1983 (against Oreol, Fisher, and CPMG)
- **Count 6** – Failure to Properly Supervise and Discipline under § 1983 (against Oreol, Fisher, and CPMG)
- **Count 9** – Wrongful Death under California Law (against Oreol, Fisher, Baroi, Ramos, Rucibwa, Naranjo, and Hansen)
- **Count 10** – Negligence under California Law (against Oreol, Fisher, Baroi, Ramos, Rucibwa, Naranjo, Hansen, and CPMG)
- **Count 11** – Violation of the Americans with Disabilities Act (against the State of California and Patton Hospital)

---

[1] Plaintiffs previously dismissed Counts 1 and 8. Count 7 for Failure to Properly Supervise and Discipline under § 1983 is alleged only against "Supervisory DOES 31-40." In the parties' proposed pretrial conference order submitted to the Court, Plaintiffs provide that, as to Count 3 for Wrongful Death under § 1983, "Plaintiffs will move to dismiss this cause of action as it is subsumed within the other causes of action." Page 3. Accordingly, in the interests of judicial economy, the Court declines to take up the parties' arguments on Count 3. Thus, Defendants' motions for summary judgment on Count 3 are **DENIED as moot** and without prejudice.

- **Count 12** – Violation of the Rehabilitation Act (against the State of California and Patton Hospital)

## B. The Parties' Evidentiary Objections[2]

Several parties lodged a number of evidentiary objections, which the Court resolves below before turning to the undisputed facts.

### 1. Plaintiffs' Ex Parte Motion to Exclude, Doc. 291

Plaintiffs move ex parte to strike or exclude the Declaration of Clark E. Smith, M.D. used to support the Motions for Summary Judgment filed by Defendants Dr. Naranjo, Dr. Hansen, and CPMG. Doc. 291. The Motion is **DENIED**.

First, Plaintiffs contend Defendants failed to designate Dr. Smith as testifying about causation. Defendants' Rule 26 Disclosures reflect otherwise. *See* Doc. 295-2, p. 3 (designating Dr. Smith "to testify regarding the issues of standard of care, causation, and damages . . ."). Further, the language from Dr. Smith's Declaration is virtually identical to that of his opinions in his Expert and Rebuttal Expert Reports. *Compare, e.g.,* Declaration, ¶ 14 *with* Expert Report, ¶ 21(a), p. 9, lines 16-18.

Next, the Court rejects Plaintiffs' bold contention that Dr. Smith's opinions on causation found in his rebuttal report were somehow untimely. Indeed, emails offered by Defendants reflect that all parties, including Plaintiffs' counsel, agreed to exchange rebuttal expert reports on August 14, 2017, the day Defendants exchanged Dr. Smith's rebuttal report. Plaintiffs do not contest the validity of those emails or rebut Defendants' argument in any way. Third, Plaintiff challenges Dr. Smith's qualifications to render opinions on causation. The Court rejects such arguments as unsupported. Dr. Smith's Report outlines his knowledge, skill, experience, training, and education on psychogenic polydipsia and

---

[2] The parties also requested judicial notice of numerous court records and filings, Docs. 288-7, 289-10, 290-16. The requests are **GRANTED**. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 157 (1969).

diabetes insipidus. Dr. Smith is a licensed psychiatrist, completed an internal medicine internship, and has treated patients with diabetes insipidus. Dr. Smith provided the facts and documents from which he based his opinions, and the Court is not persuaded that he is somehow unqualified to opine on such matters simply because he is a psychiatrist.

Finally, Plaintiffs contest Dr. Smith's opinion in his declaration "that diabetes insipidus caused [Mr. Nunez]'s death," an opinion that Plaintiffs contend did not appear in either his rebuttal or expert report. Doc. 297, p. 3. Specifically, the contested portion of Dr. Smith's declaration provides, "The definitive diagnosis at autopsy was clinical diabetes insipidus." Declaration, ¶ 21. Plaintiffs argue the only cause of death opined to by Dr. Smith's reports, however, was that Mr. Nunez died from complications of water intoxication. *Id.* Plaintiffs are incorrect. In Paragraph 3 of Dr. Smith's Rebuttal Report, he provided an opinion identical to that in his declaration: "The definitive diagnosis at autopsy was clinical diabetes insipidus, not psychogenic polydipsia." Doc. 292-3, p. 4. Accordingly, the Court considers Dr. Smith's declaration in conjunction with the pending summary judgment motions.[3]

## 2. State Defendants' Evidentiary Objections to Plaintiffs' Motion for Partial Summary Judgment, Doc. 285-12

**Exh. 2-3:** Defendants assert the exhibit does not reflect the fact asserted because it was not part of the Hospital Transfer Packet. The cited fact, Doc. 280-1, p. 5, lines 23-24 provides what the exhibit provides, Doc. 280-4, p. 5. The objection is OVERRULED.

**Exh. 9-2:** Defendants neglect to direct the Court or Plaintiffs to the factual dispute by page number, making their objections vague and ambiguous. Because the Court is unable to discern the facts Defendants are disputing, the objection is OVERRULED.

---

[3] From the Court's perspective, Plaintiffs' ex parte motion was on the threshold of lacking any arguable foundation whatsoever. Plaintiffs would do well to remember Rule 11(b)'s requirements for filing pleadings with the Court, as well as Rule 11(c)'s repercussions for failing to comply with Rule 11(b). *See* Fed. R. Civ. P. 11(b)-(c).

**Exh. 402-4:** The objection is SUSTAINED. Dr. Fisher did not testify that a psychiatric discharge summary is only provided when a patient is discharged; instead, she professed a lack of knowledge. Doc. 280-1, p. 10, lines 7-12.

**Exh. 402-5:** The objection is SUSTAINED. The cited material discusses only review of nursing discharge paperwork.

**Exh. 403, Expert Report of Dr. Bruce Gage:** Defendants assert Exhibit 403, Dr. Gage's expert report, lacks an authenticating declaration or any other supporting admissible evidence and thus cannot be considered. Plaintiffs respond that they filed Exhibit 505 from Dr. Gage's deposition, making Exhibit 505 an authenticated exhibit. In addition, Plaintiffs offered excerpts from Dr. Gage's deposition – including the court reporter's certification that Dr. Gage testified under oath – to oppose Defendants' motions for summary judgment. It would make little sense to evaluate the very same expert report differently in this motion over the other motions based on a technicality. Moreover, because the Court is sufficiently persuaded that the expert report otherwise satisfies the requirements of Rule 56(c)(4), the objection is OVERRULED. *See, e.g., Single Chip Systems Corp. v. Intermec IP Corp.*, 2006 WL 4660129 (S.D. Cal. Nov. 6, 2006) (admitting unsworn expert report that otherwise still met requirements under Rule 56(c)).

**Exh. 413-14, Theresa Baroi's Deposition:** Defendants contend the exhibit does not reflect the fact asserted. The objection is SUSTAINED as to "The Nursing Discharge Summary ["NDS"] failed to convey any of the treatment details set forth in the Protocol" and "Baroi knew that the Protocol was an ongoing treatment." Doc. 280-1, p. 8. Baroi did not testify that she knew, at the time of Mr. Nunez's discharge, that the protocol was an ongoing treatment. Further, nothing on Plaintiffs' cited page stands for the stated fact that the NDS failed to convey any of the Protocol's treatment details.

**Doc. 280-1, p. 7, lines 13-16:** Defendants object because Plaintiffs failed to cite to the record in support of the following facts: "Eight days after Patton failed to transmit any psychiatric discharge summary to the Central Jail, Ruben died of cerebral edema caused by excess consumption of water. At the time of his death, Ruben Nunez remained the

3:16-cv-01412-BEN-MDD

Hospital's patient because he had not been discharged from PSH's care." Plaintiffs respond that the facts are supported by the Hospital's exhibit filed in support of a different motion for summary judgment, Doc. 268-26. The Court, however, can discern no support for these facts on the cited document page and declines to scour the record for supporting authority. The objection is SUSTAINED.

### 3. State Defendants' Objections to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Doc. 300

**Doc. 287-4, Exh. 2:** Defendants did not identify the page or line numbers of their factual disputes, making their objections vague and ambiguous. To the extent Defendants' objections concern the two facts on page 8 of Doc. 287, lines 15-19, the objection is SUSTAINED, as those facts are not supported by the record and are not considered on summary judgment.

**Docs. 287-28 and 287-29:** Defendants object to two expert reports as lacking authenticating declarations: Dr. Alan Abrams's expert report, Doc. 287-28 (referred to as Exh. 407) and Dr. Roneet Lev's expert report, Doc. 287-29 (referred to as Exh. 409). Both reports fail to comply with Federal Rule of Civil Procedure 54(c) in several material respects. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Neither report is signed under penalty of perjury. Neither report contains an attestation that the doctor is competent to testify to the report's conclusions and opinions. Nor are the reports accompanied by any separate sworn declarations by either doctor. *See Provident Life and Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports do not qualify as affidavits or otherwise admissible evidence for the purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment."). Plaintiffs did not respond to Defendants' objections. Thus, the objections are SUSTAINED, and the Court will not consider either report.

**Doc. 287-31:** Defendants object to Exhibit 505, Dr. Gage's expert report, as lacking an authenticating declaration. The objection is OVERRULED for the same reasons as discussed previously in Section I.B.2. Although the prior objection was lodged to a different summary judgment motion, the same logic applies, as the exact same expert report is before the Court.

### 4. Plaintiffs' Objections to State Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, Doc. 304

Plaintiffs object to Defendants' submission of Dr. Kayla Fisher's Second Declaration, Doc. 281-1, ¶ 90, in which Dr. Fisher says she was "aware of [the Hospital's] actual practice to prepare and provide such a [psychiatrist discharge summary] even for a temporarily transferred patient, *if asked* for by the transfer facility." Plaintiffs contend the related portions of Dr. Fisher's affidavit, ¶¶ 9, 10, and 11 must be struck under the sham affidavit rule.

The Court has reviewed these paragraphs and rejects Plaintiffs' position. Dr. Fisher's statements do not constitute a "clear and unambiguous discrepancy" from the Hospital's prior discovery responses, as Plaintiffs contend. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("[T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."). The Hospital's discovery responses did not provide that psychiatrist discharge summaries are *never* required, prepared, or transmitted for temporarily transferred patients. Rather, the Hospital's discovery responses provided that a psychiatrist's Discharge Summary is required for patient final discharges, not for temporary transfers to jails or other facilities. Dr. Fisher's statement is different – that under different circumstances where the transferring institution requests a psychiatrist's Discharge Summary, then the Hospital provides one. Because there is no clear and unambiguous difference between the Hospital's prior interrogatory responses and Dr. Fisher's explanatory declaration, the sham affidavit rule does not apply. The objection is OVERRULED.

### C. Factual Background[4]

A number of undisputed facts are relevant to each summary judgment motion.[5] In March 2014, Ruben Nunez was arrested for assault – for throwing a rock at a vehicle. After screening revealed Mr. Nunez's history of schizophrenia, he was referred to Jail Psychiatric Services. In August 2014, a judge found Mr. Nunez not mentally competent to stand trial and committed him to Patton State Hospital ("the Hospital") for treatment to restore him to competency to stand trial. The Hospital diagnosed Mr. Nunez with schizophrenia and amphetamine dependence.

In December 2014, the Hospital staff observed Mr. Nunez drinking excessive amounts of water. After a blood panel revealed low sodium levels, the Hospital sent Mr. Nunez for further medical evaluation and treatment with Internal Medicine Physician, Rainer G. Bansuan, M.D. On February 27, 2015, Dr. Bansuan listed the following as Mr. Nunez's medical problems: (1) health maintenance, (2) +PPD, and (3) psychogenic polydipsia. Mr. Nunez did not receive any brain scans or tests to rule out pituitary adenoma or neurohypophyseal diabetes insipidus.

According to Plaintiffs' expert, Dr. Bruce Gage, in cases of psychogenic polydipsia, the dangerous conditions of hyponatremia (low sodium) and water intoxication ("the deleterious effects of electrolyte imbalances in the body") can occur within hours. Doc. 287-31, p. 27. Likewise, the amount of water necessary to kill a normal adult can be consumed within a matter of hours. *Id.* Treatment parameters for each patient vary and depend on a patient's "normal weight, physiologic function, and pattern of water consumption." *Id.* Water intoxication can be a symptom of both

---

[4] The following factual background is drawn from the relevant admissible evidence submitted by the parties. The Court's reference to certain pieces of evidence is not an indication that it is the only pertinent evidence relied on or considered. The Court has reviewed and considered all of the relevant admissible evidence submitted by the parties.

[5] To the extent additional facts are pertinent to the parties' specific motions, the Court discusses those facts in those respective sections of the Order.

psychogenic polydipsia (a psychological disorder) and diabetes insipidus (a medical disorder).

After Mr. Nunez returned to the Hospital with his diagnoses, the Hospital placed him on 1:1 observation numerous times between December 2014 and August 2015, in compliance with the Hospital's Water Intoxication Protocol. On July 27, 2015, Mr. Nunez's Hospital doctor placed him on a 28-day Water Intoxication Protocol, which included specific orders to draw blood for laboratory test serum sodium every 3 weeks, weigh Mr. Nunez before meals and at bedtime, document weights and sodium levels, inform the physician if Mr. Nunez's weight reached a certain level, check for symptoms of water intoxication at varying frequencies, and restrict fluid intake as necessary. *See* 7/27/15 Water Intoxication Protocol, PSH 1566. Mr. Nunez's records noted that his illness was controlled with medications, but his water intoxication continued despite all medication, intervention efforts, and education. Mr. Nunez continued to require redirection to prevent him from drinking excessive amounts of water.

Because the court order holding Mr. Nunez at the Hospital and requiring administration of psychotropic medication would soon expire, arrangements were made to return Mr. Nunez to court to renew the order. To appear at the court hearing, Mr. Nunez had to temporarily transfer to the San Diego Central Jail ("the Jail"). On August 5, 2015, in preparation for Mr. Nunez's transfer to the Jail, the Hospital prepared a 3-page document entitled, "Nursing Discharge Summary or Recommended Continuing Care Plan" ("Discharge Summary"). PSH 0112-14. Hospital Nurse Teresa Baroi prepared the Discharge Summary. Hospital Nurse Naphtal Rucibwa reviewed the Discharge Summary for accuracy and compliance with Hospital Policy. Finally, Hospital Nurse Wilda Ramos audited the Discharge Summary and attached additional documents to the Transfer Packet.

The Discharge Summary's purpose was to summarize Mr. Nunez's care and treatment at the Hospital to ensure continuity of care upon transfer to the Jail. The Discharge Summary referenced "water intoxication" several times throughout its three

pages. In relevant part, it provided the following information related to Mr. Nunez's water intoxication. On the first substantive line of the first page, it provided:

**Alerts:** WATER INTOX. PPD + 10 MM INDURATION.

PSH 0112. Immediately following, under "Psychiatric and Psychological Needs," the "No" box was checked for "Delusional/Hallucinations"; "Substance Abuse"; and "Other." The "Yes" box was checked for "Treatment Adherent." PSH 0112.

Under **Labs**, the Summary provided "SODIUM LEVEL 141 MM01/L Date of Last Level: ON 7/14/15." PSH 0112. The date line was left blank next to "Next Level Due." PSH 0112. The second page provided: Axis 1: SCHIZOPHRENIA, UNDIFFERENTIATED TYPE, AMPHETAMINE DEPENDENCE." PSH 0113. Next, the Summary provided:

**CURRENT MEDICAL PROBLEMS/FOCUS OF TREATMENT:**

6.1 HEALTH MAINTAINANCE [sic] = VIT D SUPPLIMENT

6.2 LATENT TB = ON INH 300 MG PO AM AND B6.

6.3 WATER INTOXICATION = WEIGHT ADJUSTMENT

* * *

PSH 0113. Under **SIGNIFICANT MEDICAL HISTORY**, boxes for "NO" were checked for several diseases, but under "OTHER," the "YES" box was checked accompanied by the comment: "Water Intox." PSH 0113. Toward the bottom of page 2, the Summary provided "**Special Precaution (Specify):** LATENT TB, WATER INTOX." Finally, on the third page, the Summary provided a "Nursing Treatment Summary (Recent Progress and Need for Specific Follow-Up)." The paragraph's last sentence provided, "MINIMAL [sic] PARTICIPATES WITH HIS TREATMENT, REMAIN WITH WATWE [sic] INTOXICATION, WEIGHT FOUR TIMES A DAY BEFORE MEALS REMAIN WITH IN PROTOCOLLIMITS, SODIUM LEVEL IS 141 MMOL/L ON 7/14/15." PSH 0114. Under **Instructions**, the Summary provided, "If there are any questions or concerns, call Patton State Hospital at (909) 425-7000." PSH 0114.

10

The Hospital included several additional documents with the Discharge Summary delivered to the Jail, including a Monthly Psychiatric Progress Note dated July 27, 2015, a Physician Quarterly Review Medical Progress Note dated June 29, 2015, an Immunization and Communicable Disease Flow Sheet, and a chest x-ray report dated October 23, 2014. In relevant part, the first page of the July 2015 Monthly Psychiatric Progress Note provided, "Mr. Nunez remains on a Water Intox. Protocol and is weighed by nurse before each meal. His weight remains within the protocol limits. His last Sodium level done on 6/25/15 was 140 MMOL/L and is within normal limits." PSH 0116. The Hospital did not include a copy of the Hospital's Water Intoxication Protocol. PSH 0116-123.

On August 6, 2015, Mr. Nunez transferred temporarily to the Jail, so that he could appear at the court hearing on August 7, 2015. During booking intake, his vital signs were within normal limits. The intake nurse asked a series of standardized questions, but did not make any notations about water intoxication in Mr. Nunez's intake records.

On the same day, psychiatrist Jorge Naranjo was offsite from the Jail. For that reason, Nurse Melinda Bernaldez called Dr. Naranjo to provide information about Mr. Nunez's transfer. During the call, Dr. Naranjo verbally ordered that Mr. Nunez continue his medications and have a lipid profile test and fasting blood sugar test to assess for potential side effects of Mr. Nunez's psychiatric medications. Dr. Naranjo relied on Nurse Bernaldez to inform him of any alerts or special circumstances pertaining to Mr. Nunez. Nurse Bernaldez did not notify Dr. Naranjo of any alerts or precautions related to water intoxication.

The next day, August 7, 2015, Dr. Naranjo worked at the Jail and reviewed Mr. Nunez's medication list. He signed off on the verbal orders he approved via phone on August 6, 2015. Dr. Naranjo did not interact with Mr. Nunez, and he did not review Mr. Nunez's Discharge Summary.

On the same day, Nurse Rogel Tinzon handled Mr. Nunez's secondary intake and performed his medical screening. Nurse Tingzon recommended Mr. Nunez "exercise and drink plenty of water." Although Nurse Tingzon noted several conditions listed in the

Discharge Summary, she did not make any notations about water intoxication in Mr. Nunez's records.

Later that day, the court renewed the order for Mr. Nunez's involuntary hold and treatment for another year. Mr. Nunez was scheduled to transfer back to the Hospital on August 13, 2015.

On August 8, 2015, emergency medicine physician, Asia Takeuchi, examined Mr. Nunez and noted his history of latent TB, facial rash, and schizophrenia, but she did not make any notations about water intoxication.

On August 9, 2015, psychiatrist Sara Hansen evaluated Mr. Nunez for current symptoms of schizophrenia. During Dr. Hansen's examination, she saw the notation in Mr. Nunez's records stating, "Mr. Nunez remains on a Water Intox. Protocol." Exh. 419-5. At the time, Dr. Hansen knew that "water intoxication" meant "[e]xcessive free water in the blood, which affects the electrolyte balance" and that if an individual's electrolyte balance was too adversely effected, water intoxication could cause death. Exh. 419-3.

Dr. Hansen wrote in Mr. Nunez's medical chart, "hyponatremia require water restriction," which meant Mr. Nunez was on a water intoxication protocol. Exh. 419-13-14. Although the records from the Hospital did not mention Mr. Nunez's history of hyponatremia, Dr. Hansen "extrapolated that when [she] read . . . the water restriction and the fact that they were monitoring his sodium." Exh. 419-12. Dr. Hansen testified that one way to manage hyponatremia is to restrict consumption of water. Exh. 419-13. At the time she saw Mr. Nunez, Dr. Hansen believed Mr. Nunez might still be suffering from water intoxication. Dr. Hansen did not control Mr. Nunez's housing and did not inquire of Jail or medical personnel about Mr. Nunez's water consumption or access.

On August 11, 2015, Mr. Nunez's blood was drawn for the labs. The lab results were reported at 5:44 a.m. on August 12, 2015, and revealed low sodium and low chloride. No doctor received or reviewed the lab results prior to Mr. Nunez's death.

During the early morning of August 12, 2015, Mr. Nunez went back and forth from the water fountain with his water cup numerous times over a few hours. While checking

cells around 2 a.m. on August 13, 2015, Deputy Paul Bell and Nurse Bienvenido Samonte observed Mr. Nunez vomiting in his cell. Believing Mr. Nunez might be dehydrated, Nurse Samonte asked Deputy Bell to take Mr. Nunez to medical for evaluation. At about 3:17 a.m., Nurse Samonte again asked Deputy Bell to take Mr. Nunez to see a nurse. During another round of cell checks at about 3:17 a.m., Deputy Bell found Mr. Nunez on the floor of his cell and contacted medical staff. Jail medical staff arrived at about 3:27 a.m. and noted Mr. Nunez had 8-millimeter pupils, no pulse, and was unresponsive. Mr. Nunez was pronounced dead at 3:52 a.m.

On August 14, 2105, Dr. Glenn Wagner performed an autopsy, revealing the cause of death to be complications of diabetes insipidus. The autopsy also revealed an enlarged pituitary and adenoma, as well as low sodium.

At the time of Mr. Nunez's transfer to the Jail, Executive Director Harold Oreol served as the senior administrator at the Hospital. At the same time, Dr. Kayla Fisher was the Medical Director at the Hospital. Neither Oreol nor Dr. Fisher had any personal involvement with Mr. Nunez's treatment at the Hospital or his transfer to the Jail.

## II. LEGAL STANDARDS

### A. Summary Judgment

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## B. Section 1983, Generally

Plaintiffs bring their constitutional claims under 42 U.S.C. § 1983. For the purpose of evaluating those claims, Mr. Nunez was a pretrial detainee: he had not been convicted of any crime but was confined in connection with criminal charges, first at the Hospital and then at the Jail, for restoration of competency for trial. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) (explaining plaintiff was "a pretrial detainee who had not been convicted of any crime"); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243 (9th Cir. 2010) (overruled on other grounds by *Castro*, 833 F.3d at 1070) (explaining plaintiff was a mentally ill "pretrial detainee confined at MDF in connection with battery and vandalism charges").

As a threshold matter, the parties dispute the applicable standard for an incapacitated pretrial detainee bringing Section 1983 claims for inadequate medical care. Defendants Hansen, Naranjo, and CPMG contend that because of Nunez's pretrial detainee status, Plaintiffs' claims must be evaluated under an objective deliberate indifference standard, citing *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). In *Gordon*, the Ninth Circuit expressly extended the objective deliberate indifference standard to medical care claims brought by pretrial detainees. *See id.* ("hold[ing] that claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard.").

Nonetheless, the State Defendants argue a higher *subjective* deliberate indifference standard should apply, instead. The State Defendants attempt to distinguish *Gordon* by noting "the decedent [in *Gordon*] was in the target defendant's custody when the death occurred." Doc. 268, p. 15. However, the State Defendants offer no support for this alleged distinction. Indeed, the Court has not located any authority suggesting Mr. Nunez's confinement *at the time of his death* in the Hospital's custody versus the Jail's custody for restoration of competency for trial somehow changes the analysis. Thus, the Court finds

14

*Gordon*'s objective deliberate indifference standard applies to Plaintiffs' claims against all defendants.

Meanwhile, Plaintiffs argue yet another standard applies: the heightened protections suggested in *Youngberg v. Romeo*, 457 U.S. 307 (1982) and *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003). In essence, Plaintiffs contend that, by virtue of his mental incapacity, Mr. Nunez's claims should be evaluated under a lesser gross negligence standard – that he had "a constitutional right to mental health care that does not substantially depart from accepted professional judgment, practice or standards." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243 (9th Cir. 2010).

The Court is not persuaded by Plaintiffs' arguments. First, Plaintiffs' position seemingly discounts *Gordon*'s holding that an objective deliberate indifference standard applies to pretrial detainees' medical care claims. To be sure, *Gordon* did not involve a *mentally incapacitated* pretrial detainee, thus leaving open the question of how, if at all, the standard might change for a pretrial detainee who is not mentally competent. The Ninth Circuit, however, has declined to adopt Plaintiffs' cited protections for mentally ill pretrial detainees. *See, e.g., Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243 (9th Cir. 2010) (overruled on other grounds by *Castro*, 833 F.3d at 1060) ("We must decline this invitation. The cases cited by the Clouthiers considered the substantive due process rights of individuals detained by the state for the purpose of addressing issues associated with their mental incapacity; they do not address the liberty interests of pretrial detainees who are confined to ensure their presence at trial.").

The Ninth Circuit in *Clouthier* reasoned the gross negligence standard did not apply because *Youngberg* and *Mink* involved differently-situated plaintiffs. *Id.* The same distinctions apply here. In contrast to Mr. Nunez, the civilly committed individual in *Youngberg* was not accused of any crimes, awaiting trial, or committed to the state hospital for restoration of competency. *Youngberg*, 457 U.S. at 307. Although *Mink* did involve an incapacitated criminal defendant, the liberty interests in *Mink* are distinguishable from those at issue here. *Mink* concerned a state mental hospital's failure to timely transfer

mentally incapacitated defendants from jail, implicating the liberty interests of freedom from incarceration and the right to restorative treatment. Such interests are not at issue here where Mr. Nunez was held at the Hospital and the Jail for crimes for which he had not yet been tried. Accordingly, the objective deliberate indifference standard clarified in *Gordon* applies to Plaintiffs' claims regarding Mr. Nunez's medical care.

### C. Medical Care Claims Under § 1983

"Medical care claims brought by pretrial detainees . . . arise under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause." *Gordon*, 888 F.3d at 1124. As explained above, such claims brought by pretrial detainees are evaluated under an objective deliberate indifference standard. *Id.* Accordingly, a pretrial detainee's medical care claim against an individual defendant requires:

> (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125.

As to the third element, the defendant's conduct must be objectively unreasonable, which turns on the facts and circumstances of each particular case. *Id.* Importantly, these claims require proof of "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* Thus, contrary to a prisoner bringing claims under the Eighth Amendment, a pretrial detainee bringing claims under the Fourteenth Amendment "need not prove those subjective elements about the [defendant]'s *actual* awareness of the level of risk." *Id.* at 1125, n. 4 (internal quotation marks omitted) (emphasis added). Further, "[a] court must make this determination from the perspective of a reasonable

officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* "[T]he mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.*

## III. DEFENDANTS' SUMMARY JUDGMENT MOTIONS

Because Defendants' summary judgment motions concern many of the same claims and arguments, the Court addresses the motions together in the order of the claims at issue.

### A. Section 1983 Claims (Counts 2, 4, 5, and 6)

Plaintiffs bring Counts 2 and 4 under § 1983 for deliberate indifference to Mr. Nunez's serious medical needs and for violation of Plaintiffs' rights of association with Mr. Nunez. In Count 2, Plaintiffs claim various Hospital and Jail defendants were deliberately indifferent to Mr. Nunez's serious medical needs, ultimately causing his death. A medical claim of deliberate indifference against an individual requires: (1) the pretrial detainee had a serious medical need; (2) the individual was deliberately indifferent to that need; and (3) this indifference caused harm to the pretrial detainee. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2014). As discussed above, deliberate indifference is defined objectively and constitutes something "akin to reckless disregard." *Gordon*, 888 F.3d at 1125.

In Count 4, Plaintiffs claim various Hospital and Jail defendants violated their right of association with Mr. Nunez. As to each defendant, Count 4 is necessarily premised on a finding that the defendant was deliberately indifferent in Count 2. *See Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("[F]or the same reasons that the Toguchis' deliberate indifference claim fails, their due process claim must also fail.") (granting summary judgment in favor of defendant on familial association claim under § 1983).

Plaintiffs additionally bring Counts 5 and 6 under § 1983 for Failure to Train and Failure to Supervise/Discipline against Supervisory Jail Defendants Oreol and Dr. Fisher, as well as CPMG. Like Plaintiffs' claim for Right of Association, these claims also depend on the existence of a constitutional violation in Count 2.

Because the parties do not dispute the first element of Count 2 – that Mr. Nunez had a "serious medical need" – the Court turns to the remaining two elements, which defendants contest in their respective motions for summary judgment, Docs. 268, 273, 274, and 275.

### 1. Individual Hospital Defendants: Baroi, Ramos, Rucibwa

The Hospital Nurses Baroi, Ramos, and Rucibwa ("Nurse Defendants") jointly move for summary judgment on Plaintiffs' § 1983 deliberate indifference to serious medical needs claim. In support, the Nurse Defendants contend (1) they adequately disclosed Mr. Nunez's water intoxication issue in the Discharge Summary and Transfer Packet, and (2) Mr. Nunez's death was so far attenuated from their conduct that Plaintiffs cannot show causation, particularly where numerous subsequent events broke any causal chain.

First, the Nurse Defendants contend the three-page Disclosure Summary and accompanying documentation's numerous references to "water intox." or "water intoxication" were sufficient to put the Jail on notice that Mr. Nunez had an ongoing water intoxication problem, which required monitoring. Plaintiffs respond that the Disclosure Summary's typos and misleading information (e.g. WATER INTOXICATION = WEIGHT ADJUSTMENT) coupled with the Hospital's failure to attach their Water Intoxication Protocol were insufficient to notify the Jail.

The following facts are relevant to the Court's analysis. First, the Nurse Defendants' involvement with Mr. Nunez's death is limited to: Nurse Baroi's preparation of the allegedly deficient Discharge Summary; Nurse Rucibwa's review of the Discharge Summary for accuracy and compliance with Hospital Policy; and Nurse Ramos's auditing of the Discharge Summary and attachment of additional documents to the Transfer Packet, including Mr. Nunez's most recent July 2015 Monthly Psychiatric Progress Note.

The first page of the brief three-page Discharge Summary document provided, "Mr. Nunez remains on a Water Intox. Protocol and is weighed by a nurse before each meal. His weight remains within the protocol limits. His last Sodium level done on 6/25/15 was 140 MMOL/L and is within normal limits." PSH 0116. The Discharge Summary, alone, referenced "water intox." or "water intoxication" five separate times, including under

1    "Alerts," "Current Medical Problems/Focus of Treatment," under "Significant Medical
2    History," and under "Special Precaution (Specify)." In addition, the Discharge Summary
3    made multiple references to Mr. Nunez's schizophrenia diagnosis, weight checks, and
4    sodium levels. Finally, under "Instructions" on the third page, the Discharge Summary
5    provided, "If there are any questions or concerns, call Patton State Hospital at (909) 425-
6    7000." PSH 0114. Attached to the Discharge Summary was Mr. Nunez's most recent July
7    2015 Monthly Psychiatric Progress Note, which provided: "Mr. Nunez remains on a Water
8    Intox. Protocol and is weighed by nurse before each meal. His weight remains within the
9    protocol limits. His last Sodium level done on 6/25/15 was 140 MMOL/L and is within
10   normal limits." PSH 0116.

11        In response, Plaintiffs emphasize that the Discharge Summary had typographical
12   errors and was not abundantly clear in all areas, e.g., "WATER INTOXICATION =
13   WEIGHT ADJUSTMENT." Plaintiffs also emphasize that Mr. Nunez's Transfer Packet
14   lacked a Water Intoxication Protocol. This is not a case, however, where one or two
15   references to a dangerous medical condition are buried within a fifteen-page medical
16   record, or worse still, not referenced at all. Instead, this case involves a brief three-page
17   Discharge Summary with *five individual references* to Mr. Nunez's water intoxication
18   issue, including designating that issue under headings, such as "Alerts" and "Special
19   Precaution." Indeed, the very first substantive line of Mr. Nunez's Discharge Summary
20   provides, "**Alerts:** WATER INTOX. PPD + 10 MM INDURATION." The Discharge
21   Summary invited the Jail to call with any questions, including by providing the Hospital's
22   phone number. Thus, to the extent the information was not clear to the Jail medical team
23   or required further explanation, the Jail could have called the Hospital. Further, the Nurse
24   Defendants could reasonably expect their audience to have some familiarity with the
25   diagnosis of water intoxication in conjunction with schizophrenia. The Nurse Defendants
26   compiled a Discharge Summary and Transfer Packet for Jail *medical* personnel, not laymen
27   who would be unfamiliar with such diagnoses.

28

Importantly, the record is devoid of evidence that the Jail medical team was somehow confused or misled by the Nurse Defendants' transfer documentation, including the Discharge Summary. Dr. Naranjo never reviewed the Discharge Summary. Dr. Hansen did review it and even went so far as to notate Mr. Nunez's water intoxication condition, which she assumed was either no longer active or was being handled by the Jail medical staff. Nurse Bernaldez, who conducted Mr. Nunez's intake at the Jail, admitted that she and other intake nurses do not "do a thorough review of the discharge summary" because "intakes are a lot like – you know, the – the arrivals of the inmates being arrested sometimes are continuous, like back-to-back. So the intake nurse has to attend to that. And they cannot really review the discharge summary." Doc. 268-22, p. 5. Nurse Bernaldez understood her responsibility to be limited to Mr. Nunez's medication list, not his medical conditions outlined in a Discharge Summary. Thus, Plaintiffs fail to proffer any compelling causation argument as to how Jail personnel would have behaved differently had some alternative language been included in his Discharge Summary, had the Discharge Summary been free of typographical errors, or had the Protocol been included in Mr. Nunez's transfer paperwork,.

Undeniably, causation is a fact question. However, Plaintiffs have not carried their burden to show how a reasonable jury could find in their favor. *See Fazio v. City & Cnty. of S.F.*, 125 F.3d 1328, 1331 (9th Cir. 1997) (explaining a mere scintilla of evidence is not sufficient "to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some significant probative evidence tending to support the complaint"). As framed by the Supreme Court, the ultimate question on summary judgment is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Here, the evidence before the Court on causation is so one-sided that the Nurse Defendants must prevail as a matter of law.

For the previous reasons, no reasonable jury could find the Nurse Defendants' documentation efforts, however imperfect, rose to the level of reckless disregard for Mr. Nunez's serious medical health condition necessary to show deliberate indifference. Likewise, no reasonable jury could find the Nurse Defendants' documentation efforts somehow *caused* or *set in motion* events that caused Mr. Nunez's death. Without evidence, Plaintiffs' unsupported arguments to the contrary do not create a genuine issue of material fact. Thus, summary judgment is **GRANTED** in the Nurse Defendants' favor on Counts 2 and 4.

Because Plaintiffs cannot show causation as to the § 1983 or state law claims, summary judgment is additionally **GRANTED** in favor of the Nurse Defendants on Counts 9 and 10 for state law negligence and wrongful death. *See, e.g., Saelzler v. Advanced Group 400*, 23 P.3d 1143, 1154 (Cal. 2001) ("[In a negligence action,] [n]o matter how inexcusable a defendant's act or omission might appear, the plaintiff must nonetheless show the act or omission caused, or substantially contributed to, her injury. Otherwise, defendants might be held liable for conduct which actually caused no harm . . .").

## 2. Supervisory Hospital Defendants: Dr. Fisher and Oreol

Supervisory Hospital Defendants, Dr. Fisher and Oreol, move for summary judgment on Plaintiffs' Counts 2 and 4. At the time of Mr. Nunez's transfer to the Jail, Oreol served as the Hospital's Executive Director, and Dr. Fisher served as the Hospital's Medical Director. Neither Oreol nor Dr. Fisher had any personal involvement with Mr. Nunez's treatment at the Hospital or his transfer to the Jail. Nonetheless, as supervisors, Oreol and Dr. Fisher may be held liable "if there exists . . . a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). To demonstrate a sufficient causal connection, a plaintiff must "show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Id.* For deliberate indifference cases, the causal connection can be established by setting in motion a series of acts by others leading to the injury, or by "knowingly refusing

1   to terminate a series of acts by others, which the supervisor knew or reasonably should have

2   known would cause others to inflict a constitutional injury." *Id.*

3       Plaintiffs identify the following facts to show Dr. Fisher and Oreol are liable. Dr.

4   Fisher and Oreol failed to properly supervise and train the Hospital psychiatrists to comply

5   with the Hospital's policy of having a psychiatrist write a Discharge Summary within four

6   days of a patient's discharge. Instead, they allowed nurses to compile the Transfer Packet,

7   including drafting the Discharge Summary. Additionally, Dr. Fisher and Oreol did not

8   implement a policy under which a psychiatrist reviewed a patient's Discharge Summary.

9   Finally, they failed to implement a policy requiring the Water Intoxication Protocol to be

10   included with the Transfer Packet.

11       Plaintiffs' claims must fail, however, because no reasonable jury could find Dr.

12   Fisher and Oreol's lack of policies set in motion the series of acts by the Jail medical team

13   leading to Mr. Nunez's death. First, as discussed previously, a jury could not reasonably

14   find the Nurse Defendants' documentation efforts to be so insufficient as to not put the Jail

15   on notice of Mr. Nunez's condition. Thus, the fact that nurses, rather than doctors, created

16   the Transfer Packet has no substantial bearing on the Jail medical team's treatment of Mr.

17   Nunez. Again, Plaintiffs fail to identify evidence showing the Jail medical team was

18   somehow confused or misled by the Hospital's transfer documentation, including its

19   Discharge Summary.

20       Second, Plaintiffs fail to identify evidence showing how Jail personnel might have

21   behaved differently had the Protocol been included or had the Discharge Summary been

22   drafted differently. Without more, Plaintiffs have not carried their burden to show

23   causation such that a reasonable jury could find in their favor.

Accordingly, summary judgment is **GRANTED** on Counts 2, 4, 5, and 6, in favor of Dr. Fisher and Oreol.[6] Because causation is an essential element of Plaintiffs' state law wrongful death and negligence claims, summary judgment is also **GRANTED** in favor of Dr. Fisher and Oreol on Counts 9 and 10. *See supra, Saelzler v. Advanced Group 400*, 23 P.3d 1143, 1154 (Cal. 2001).

### 3. Hospital Defendants' Qualified Immunity

In the alternative, each of the Hospital Defendants is entitled to summary judgment on qualified immunity grounds. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 135 S.Ct. 348, 350 (2014). Its protection applies regardless of whether a government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, to defeat the Hospital Defendants' qualified immunity defense, Plaintiffs must show (1) Mr. Nunez suffered a deprivation of a constitutional right, and (2) Mr. Nunez's right was "clearly established" at the time of the alleged misconduct. *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

The Court considers the clearly established prong first. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that *what he is doing* violates that right." *Id.* Accordingly, Plaintiffs must show "precedent on the books" at the time of the Nurse Defendants' documentation efforts that "would have made clear to them that their actions violated the Constitution." *See id.*

---

[6] Counts 5 and 6 for Failure to Train and Failure to Supervise/Discipline under § 1983 also depend on an underlying constitutional violation. Thus, without a constitutional violation, Plaintiffs' Counts 5 and 6 must likewise fail.

1   Plaintiffs argue the three Nurse Defendants are personally liable because they failed
2   to sufficiently document Mr. Nunez's water intoxication condition in his transfer
3   paperwork, including by failing to attach the Hospital's Water Intoxication Protocol.
4   Likewise, Plaintiffs contend Dr. Fisher and Oreol are liable because of their failure to
5   implement policies requiring psychiatrists, rather than nurses, to create the Discharge
6   Summary, and requiring attachment of the Water Intoxication Protocol. To contest the
7   Hospital Defendants' qualified immunity, Plaintiffs respond only by generally referring to
8   the discussion in *Youngberg v. Romeo*, 457 U.S. 307 (1982) about mental hospital patients'
9   rights to food, shelter, and care. Thus, Plaintiffs fail to identify any "precedent on the
10  books" with facts similar to Mr. Nunez's case. The Court, too, conducted an unsuccessful
11  search for precedent, which might have put the Hospital Defendants on notice that (1) the
12  Nurses' documentation of Mr. Nunez's health condition with five references to "water
13  intoxication" were constitutionally deficient, (2) that their failure to include the Hospital's
14  Water Intoxication Protocol with the transfer paperwork amounted to a clear constitutional
15  violation, and (3) that their failure to implement policies to that effect was also a
16  constitutional violation.

17      Accordingly, the Court must ask, viewing the evidence most favorably to Plaintiffs
18  and given existing case law in August 2015, was it "beyond debate" that the Nurse
19  Defendants created medically unreasonable transfer paperwork to continue Mr. Nunez's
20  care at the Jail? Was it "beyond debate" that the Hospital's policies of allowing nurses to
21  complete transfer paperwork and not requiring inclusion of the Water Intoxication Protocol
22  were medically unreasonable? Here, the answer is no, even assuming that each of the
23  Hospital Defendants was aware of the serious nature of water intoxication. As discussed
24  above, the paperwork included more than five conspicuously placed references to some
25  form of "water intoxication," invited the Jail to call the Hospital for any needed
26  clarification, and notified the Jail that Mr. Nunez "remains on a water intox. protocol."
27  Further, the Jail psychiatrist who reviewed Mr. Nunez's transfer paperwork, Dr. Hansen,
28  understood his paperwork to convey that Mr. Nunez had experienced water intoxication

issues in the past and potentially still experienced them at that time. The Court cannot find that either the Nurse Defendants' documentation efforts or Oreol and Dr. Fisher's policies were "beyond debate" unreasonable. Accordingly and in the alternative, the Hospital Defendants are entitled to qualified immunity.

### 4. Jail Defendants: Dr. Sara Hansen, Dr. Jorge Naranjo, and CPMG

#### a. Dr. Hansen

As to Plaintiffs' Section 1983 claims (Counts 2 and 4), Dr. Hansen argues summary judgment is warranted because she behaved reasonably under the circumstances in treating Mr. Nunez, and her inaction did not rise to the level of reckless disregard required for a serious medical need claim. Plaintiffs respond that a reasonable jury could find Dr. Hansen was deliberately indifferent to Mr. Nunez's serious medical need by virtue of the facts before her coupled with her inaction. Specifically, Plaintiffs argue that Dr. Hansen knew Mr. Nunez suffered from water intoxication in the past and potentially still suffered from it but nonetheless, failed to communicate Mr. Nunez's condition or need for monitoring to any medical staff and failed to recommend restrictive housing so that Mr. Nunez's water consumption could be limited. Doc. 288, p. 15. Because whether a defendant's conduct amounted to objective deliberate indifference turns on the facts and circumstances of each particular case, the Court considers the specific circumstances known to Dr. Hansen. *See Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The undisputed facts show that Dr. Hansen did not control where Mr. Nunez was housed within the Jail and did not control Mr. Nunez's access to water within the Jail. Dr. Hansen was scheduled to evaluate Mr. Nunez in her capacity as a psychiatrist. At the time of Mr. Nunez's appointment with Dr. Hansen, Mr. Nunez had already been at the Jail for three days and evaluated by a medical physician, Dr. Takeuchi. As the first medical physician to see Mr. Nunez, Dr. Takeuchi was responsible for documenting and managing Mr. Nunez's medical conditions. Dr. Hansen expected Mr. Nunez's medical issues to be managed by the Jail's medical staff, not the psychiatric staff.

During Mr. Nunez's evaluation with Dr. Hansen, Mr. Nunez did not show any signs of an acute psychotic episode. His mood was "good," and he expressed no suicidal or homicidal ideation. Dr. Hansen did not observe any behaviors to give her pause or alert her to the fact that Mr. Nunez's water intoxication condition was not being managed by the Jail's medical staff.

At her deposition, Dr. Hansen admitted her opinion at the time of her examination that Mr. Nunez was still potentially suffering from water intoxication. Dr. Hansen was familiar with the condition of "water intoxication"; treatment for that condition, including by restricting water and monitoring sodium levels; and the condition's potentially lethal outcome. She knew Mr. Nunez's access to water needed to be restricted, but she did not know if where Mr. Nunez was housed restricted water or provided unlimited access. Dr. Hansen did not recall asking Mr. Nunez how much water he had consumed or taking any other affirmative steps, e.g. a weight check or asking jail personnel, to determine how much water Mr. Nunez drank within the previous 24 hours. Dr. Hansen did not alert medical staff or personnel about Mr. Nunez's condition. Instead, Dr. Hansen noted in Mr. Nunez's medical chart, "hyponatremia require water restriction," which she testified meant that Mr. Nunez was on some form of water intoxication protocol, a protocol about which she did not know anything else. Dr. Hansen then ordered a non-urgent blood panel.

Perhaps, in hindsight, upon seeing the water intoxication condition in Mr. Nunez's records, Dr. Hansen should have crossed her t's and dotted her i's by personally assessing Mr. Nunez's current water intoxication condition. Or, perhaps, Dr. Hansen should have taken any number of steps to ensure that another medical practitioner had done so. But, Plaintiffs have not identified any behaviors exhibited by Mr. Nunez that would have alerted Dr. Hansen to the urgency of his water intoxication condition or that it was not being treated. Nor have Plaintiffs identified any facts that should have alerted Dr. Hansen that the water intoxication condition noted in Mr. Nunez's record was not being managed by the Jail's medical team. As a psychiatrist, Dr. Hansen reasonably relied on her medical colleagues to help manage Mr. Nunez's care, particularly his medical conditions.

3:16-cv-01412-BEN-MDD

Thus, when considering the facts known to Dr. Hansen at the time, no reasonable jury could find that Dr. Hansen's inaction and reliance on other Jail medical staff was so unreasonable under the circumstances that it rose to the level of reckless disregard to Mr. Nunez's serious medical needs. Arguably, Dr. Hansen's inaction amounted to negligence and would support a medical malpractice action, but mere negligence is not the standard for a Section 1983 claim. Summary judgment is **GRANTED** in favor of Dr. Hansen on Plaintiff's Counts 2 and 4. *See supra, Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

### b. Dr. Jorge Naranjo

Like Dr. Hansen, Dr. Naranjo contends summary judgment is appropriate on Plaintiffs' deliberate indifference claim because no reasonable jury could find his conduct was so objectively unreasonable that it rose to the level of reckless disregard. Thus, the Court considers the relevant facts and circumstances surrounding his conduct.[7]

At the time of Mr. Nunez's intake at the Jail, Dr. Naranjo was offsite at the Central Jail. In accordance with Jail procedure, Dr. Naranjo received information about Mr. Nunez by telephone from Nurse Bernaldez, information on which he relied. Nurse Bernaldez did not inform Dr. Naranjo of any serious or urgent medical concerns, such as water intoxication, and Dr. Naranjo did not ask if any existed. Dr. Naranjo understood it to be the nurse's job to inform the doctor of any alerts or serious medical conditions, as nurses had done in the past. There is no evidence that Mr. Nunez's psychogenic polydipsia or water intoxication diagnoses were ever communicated to Dr. Naranjo.

The next day, Dr. Naranjo worked onsite at the Jail but did not review Mr. Nunez's Discharge Summary. Although Dr. Naranjo contends his sole responsibility was to "bridge" Mr. Nunez's medications by continuing them from the Hospital, Plaintiffs offer

---

[7] As required on summary judgment, where disputes of fact exist that are properly supported by the record, the Court construes those facts in the light most favorable to the nonmovants, Plaintiffs.

evidence that Dr. Naranjo's responsibility was something more. For example, the Chief Medical Officer of the San Diego Sheriff's Department testified that it was the job of the "psychiatrist who was in charge of the psychiatric stabilization unit" – in this case, Dr. Naranjo – to make housing recommendations so that the patient could be placed in housing where he could be monitored, as well as a housing unit with limited or no access to water. *See* Doc. 290-3 (Exh. 415-11, 415-20 – 22). Nurse Bernaldez testified that she left Mr. Nunez's Discharge Summary at the Psychiatric Security Unit for Dr. Naranjo's review, but Dr. Naranjo never reviewed it. Indeed, Plaintiffs offer evidence to show that Dr. Naranjo was expected to review the Discharge Summary and understand the patient's needs, typically within 24 hours. Dr. Naranjo admits he had previously addressed water intoxication in patients by entering orders to prevent them from drinking excessive amounts of water, and he understood the importance of weight checks to monitor a patient's water intake.

Thus, on the present evidentiary record, disputes of material fact exist as to the scope of Dr. Naranjo's responsibilities with respect to Mr. Nunez and the reasonableness of his behavior under the circumstances. Construing those facts in Plaintiffs' favor, a jury could reasonably find that Dr. Naranjo's inaction, including his failure to ever review Mr. Nunez's Discharge Summary,[8] amounted to a failure of care rising to the level of deliberate indifference to Mr. Nunez's serious medical needs. Summary judgment is **DENIED** on Plaintiffs' Count 2 against Dr. Naranjo.

---

[8] Dr. Naranjo contends that, even if he had reviewed Mr. Nunez's Discharge Summary, it was deficient of information, and he would not have understood Mr. Nunez's water intoxication condition. Dr. Naranjo also points to Plaintiffs' arguments against the Hospital that the Discharge Summary was not sufficient to properly ensure continuity of care. The two are not mutually exclusive, however: Plaintiffs' contention does not equate to a total failure to put Dr. Naranjo on any notice of Mr. Nunez's condition. Moreover, as outlined in the Background section, Mr. Nunez's Discharge Summary contained multiple conspicuous notations about his water intoxication. Thus, to the extent that is Dr. Naranjo's theory, the jury is better equipped to weigh the opinions of dueling experts on that issue.

Dr. Naranjo moves for summary judgment on Plaintiffs' § 1983 claim for violation of Plaintiffs' right to familial association. *See Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985) ("[E]xisting Supreme Court and Ninth Circuit precedent establish that a parent has a constitutionally protected liberty interest in the companionship and society of his or her child."). Because Dr. Naranjo's sole argument is that Plaintiffs cannot establish the underlying constitutional violation discussed in Count 2, summary judgment is also **DENIED** on Plaintiffs' Count 3.

### c. CPMG

In August 2015, Correctional Physicians Medical Group, Inc. ("CPMG") had a contract with the County of San Diego to provide psychiatrists and psychiatric staff to deliver treatment and services to inmates and patients at County of San Diego Detention Facilities. At that time, CPMG employed both Dr. Naranjo and Dr. Hansen to provide psychiatric services at the Jail where Mr. Nunez transferred. CPMG moves for summary judgment on Plaintiffs' Count 5 for Failure to Train and Count 6 for Failure to Supervise and Discipline, both brought under Section 1983. Doc. 275-1.

In opposition, Plaintiffs first assert CPMG can be held liable under a *respondeat superior* theory based on the doctors' conduct. Plaintiffs contend the Supreme Court's contrary decision in *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978) does not apply to CPMG, as a private entity. In *Monell*, the Supreme Court held a municipality or local government can be sued for constitutional violations under § 1983. *Id.* Importantly, whether *Monell* applies to suits against *private* entities under § 1983 is a threshold question because, if it does, *Monell* establishes the parameters of CPMG's liability.

In contrast to Plaintiffs' protests, Ninth Circuit law is settled on that point: *Monell* applies to private entities like CPMG. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012). Thus, CPMG cannot be held liable under a *respondeat superior* theory. *See id.* ("[T]he text of § 1983 cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor."). Rather, to bring a *Monell* claim against CPMG, Plaintiffs

29

must show that (1) CPMG acted under color of state law,[9] (2) a constitutional violation occurred, and (3) the violation was caused by an *official policy or custom* of CPMG. *See id.* (emphasis added).

Plaintiffs premise their Count 5 for Failure to Train on their contention that Dr. Naranjo and Dr. Hansen violated Mr. Nunez's constitutional rights[10] through their deliberate indifference to his serious medical needs, in conjunction with the following facts: (1) CPMG did not provide training on how to use its electronic medical records system, "JIMS," and (2) CPMG did not train its doctors on how to use the "alerts" section of JIMS, where patients' critical medical information is kept.[11] Doc. 290, p. 23. Notably, the evidence Plaintiffs proffered to establish CPMG's policy of failing to train its contract employees on JIMS is focused exclusively on two doctors, Dr. Hansen and Dr. Naranjo.

CPMG argues that, even assuming Mr. Nunez's constitutional rights were violated, Plaintiffs fail to show a causal connection between the alleged failure to train on the use of JIMS, including "alerts," and Mr. Nunez's death. Indeed, Plaintiffs' Opposition identifies multiple alleged breaches of the standard of care by Dr. Naranjo and Dr. Hansen, but not one of those alleged breaches concerns the failure to use JIMS properly. Moreover, as

---

[9] The parties do not dispute the first element – that CPMG acted under color of state law.

[10] The Court resolves CPMG's motion based on Plaintiff's failure to offer evidence going to causation. Thus, for purposes of CPMG's motion only, the Court assumes a constitutional violation occurred.

[11] Plaintiffs additionally assert CPMG did not provide *any* training at all to its doctors, citing Exhibits 423-427. Plaintiffs fail, however, to direct the Court to any particular portion of those exhibits, which contain nearly 200 pages of discovery responses. The Court declines to search every page for support of Plaintiffs' alleged fact and thus does not consider this fact, which is unsupported by the record. *See, e.g, Ragas v. Tenn Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."). Furthermore, Plaintiffs' "fact" is belied by Plaintiffs' own Exhibit 423, which includes extensive orientation materials CPMG provided to its independent contractors. The Court rejects Plaintiffs' fact as unsupported.

evidence of the failure to train, Plaintiffs rely only on evidence concerning two employees, which is not enough to constitute a program-wide policy of deliberate indifference. *See, e.g., Blankenhorn v. City or Orange*, 485 F.3d 463, 484 (9th Cir. 2007) ("[E]vidence of the failure to train a single officer is insufficient to establish a muncipality's deliberate policy."). "[A]bsent evidence of a program-wide inadequacy in training, any shortfall in a single [employee's] training can only be classified as negligence on the part of the municipal defendant – a much lower standard of fault than deliberate indifference." *Id.* The Court finds shortfalls in only two employees' trainings similarly falls under negligence, not deliberate indifference. Because the connection between CPMG's alleged failure to train and the alleged constitutional violations are both unsupported and are far too tenuous to satisfy the high *Monell* standard, summary judgment is **GRANTED** in favor of CPMG on Count 5.

As to Count 6 for Failure to Supervise and Discipline Dr. Naranjo and Dr. Hansen, Plaintiffs' evidence is virtually nonexistent. Plaintiffs make a variety of unsupported arguments based on assumptions, rather than facts, none of which the Court can consider on summary judgment. For example, Plaintiffs rely on an alleged "prior incident in which Naranjo failed to enter information into JIMS and failed to coordinate a patient's care with the nursing staff." Doc. 290, p. 24. But, an examination of Plaintiffs' cited evidence does not support such facts. "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). If a plaintiff fails to present any evidence to support a claim, summary judgment in favor of the defendant is appropriate. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007). Because no reasonable jury could find for Plaintiffs on Count 6, summary judgment is **GRANTED** in favor of CPMG.

**B. State Law Claims for Wrongful Death and Negligence (Counts 9 and 10)**

Drs. Naranjo and Hansen additionally move for summary judgment on Plaintiffs'

state law negligence and wrongful death claims.[12]  Both doctors argue Plaintiffs' state law claims are barred by the statute of limitations.  In addition, Dr. Naranjo contests the merits of Plaintiffs' claims.  As a threshold issue, the Court first considers the statute of limitations argument.

### 1. Statute of Limitations

The doctors contend that Plaintiffs' state law negligence and wrongful death claims are barred by the applicable Statute of Limitations, Cal. Code Civ. P. § 340.5.  In relevant part, Section 340.5 provides:

> In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first.

The doctors argue the Second Amended Complaint substituting both of them as DOES was filed more than one year from the date of Mr. Nunez's death on August 13, 2015 – the "injury" used in § 340.5, which triggers the one-year limitation.  Plaintiffs first sought leave to file their Second Amended Complaint naming Dr. Hansen and Dr. Naranjo on February 14, 2017.  Doc. 58.  Plaintiffs did not file their Second Amended Complaint naming both doctors until July 13, 2017.  Doc. 125.

Plaintiffs respond that they are protected by the relation-back doctrine of Cal. Code Civ. P. § 474 because they were ignorant of the doctors' identities.[13]  Section 474 provides that when a plaintiff is ignorant of a defendant's identity, the plaintiff may state that fact in

---

[12] The Hospital Defendants also moved for summary judgment on Plaintiffs' state law claims.  However, as discussed previously, because the Hospital Defendants are entitled to judgment as a matter of law on the matter of causation for the § 1983 claims, summary judgment is likewise warranted on their state law claims.  Thus, the Court does not re-address the Hospital Defendants' motion here.

[13] The parties do not dispute that the relation-back provisions of state law, rather than Fed. R. Civ. P. 15(c), govern a federal Section 1983 action.  Ninth Circuit case law is also clear on that point.  *See Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 768 (9th Cir. 1989).

32

the complaint and name such defendant by a fictitious name. *Dover v. Sadowinski*, 194 Cal. Rptr. 866, 868 (Cal. Ct. App. 1983). California courts have interpreted Section 474's requirement broadly:

> The phrase 'when the plaintiff is ignorant of the name of a defendant' in . . . section 474 has not been interpreted literally. The plaintiff is deemed 'ignorant of the name' if he knew the identity of the person but was ignorant of facts giving him a cause of action against the person, or knew the name and all the facts but was unaware that the law gave him a cause of action against the fictitiously named defendant and discovered that right by reason of decisions rendered after commencement of the action.

*Id.* Further, "[t]he lack of knowledge of the true name of a defendant . . . must be 'real and not feigned.'" *Id.* "However, if the plaintiff is actually ignorant of the defendant's identity, the section 474 relation-back doctrine applies even if that ignorance is the result of the plaintiff's negligence." *Woo v. Superior Court*, 89 Cal. Rptr. 2d 20, 25 (Cal. Ct. App. 1999).

Plaintiffs contend they were not aware of Dr. Hansen and Dr. Naranjo's identities until the County of San Diego filed its third-party Complaint on October 31, 2016. The doctors respond that Plaintiffs' original Complaint reflects Plaintiffs had access to Mr. Nunez's "jail medical records," which showed a "history of . . . hyponatremia . . . which required water restriction." Doc. 1 at 1:15-17, 6:12-13. There is no dispute that the Jail's medical records repeatedly reference Dr. Hansen and Dr. Naranjo as providers for Mr. Nunez's medical care at the Jail in August 2015. *See, e.g.,* Doc. 301-4 (CSD003065) and accompanying Declaration, Doc. 301-1. However, Plaintiffs assert that they did not have access to Mr. Nunez's Jail medical records at the time of filing their Complaint because the County repeatedly denied Plaintiff Lydia Nunez's requests for them. Doc. 288-1, ¶ 5 (Declaration). According to Plaintiffs' counsel's Declaration, Doc. 288-1, the quoted passage in Plaintiffs' original Complaint is from the Medical Examiner's report, not the Jail records. Plaintiff's explanation is plausible.

In cases in which California courts have applied the statute of limitations despite Section 474, the facts before those courts showed clearly that the plaintiff's claimed

ignorance of the defendant's identity was not in good faith. *See, e.g., Woo*, 89 Cal. Rptr. 2d at 27 (applying SOL where plaintiff inconsistently asserted she "forgot" defendant's identity or "never knew" it); *Dover*, 194 Cal. Rptr. at 868-69 (applying SOL where, among other facts indicating plaintiff's knowledge of the defendant's identity, uncontradicted evidence showed that plaintiff had spoken with the defendant on numerous occasions during the decedent's hospitalization prior to filing the complaint). Here, the doctors have not offered such a clear showing, which would permit the Court to infer Plaintiffs' alleged ignorance was feigned. Because the evidence before the Court is not enough to show as a matter of law that Plaintiffs' claimed ignorance of Dr. Hansen or Dr. Naranjo's identities was not actual and in good faith, Plaintiffs' claims against them are not barred by the statute of limitations. Summary judgment is **DENIED** on this point.

## 2. The Merits

Dr. Naranjo additionally argues that Plaintiffs' negligence and wrongful death claims fail as a matter of law. Dr. Hansen does not argue the merits. A claim of negligence requires duty, breach, causation, and damages. *Hayes v. County of San Diego*, 160 Cal. Rptr. 3d 684, 688 (Cal. 2013). A statutory claim for wrongful death under California Code of Civil Procedure § 377.60 requires negligence, causation, the death of another, and damages. *Boeken v. Philip Morris USA, Inc.*, 108 Cal. Rptr. 3d 806, 820 (Cal. 2010).

First, Dr. Naranjo contends that Plaintiffs cannot show a breach of the standard of care applicable to Dr. Naranjo, which is "a matter peculiarly within the knowledge of experts." *Landeros v. Flood*, 131 Cal. Rptr. 69, 74 (Cal. 1976). In support, Dr. Naranjo cites the declaration of his expert, Dr. Clark Smith, who opined that Dr. Naranjo did not violate the standard of care owed to Mr. Nunez. In part, Dr. Smith opines that Dr. Naranjo had no obligation to do anything more than approve medication orders for Mr. Nunez, including no obligation to review Mr. Nunez's chart or Discharge Summary. Meanwhile, Plaintiffs offer their own expert's opinion, which directly contradicts that of Dr. Smith. *See* Doc. 298-2 (Ex. 414-5 – 10). Plaintiffs' expert, Dr. Gage, opines that Dr. Naranjo's complete failure to review the Disclosure Summary, including his failure to make any

effort to find Mr. Nunez's records to review them, was "an egregious departure from the standard of care." Given the dueling experts on this element, Dr. Naranjo is not entitled to judgment as a matter of law.[14]

Dr. Naranjo next attacks the causation element, contending that Mr. Nunez died of diabetes insipidus, as opined by Dr. Smith. In essence, Dr. Naranjo argues that because diabetes insipidus is a medical condition, not a psychological one treated by psychiatrists, he cannot be at fault. In other words, Dr. Naranjo attempts to pass the buck. He contends that "Mr. Nunez's medical condition would have been appropriately managed and treated by medical, not psychiatric, physicians," and thus, as a psychiatrist, Dr. Naranjo's treatment could not have contributed to Mr. Nunez's death. Doc. 274-1, p. 27.

Dr. Smith's opinion further explains, "Different caused [sic] of water intoxication may require different treatment, and . . . water restriction was certainly not the treatment of choice for neurohypophyseal diabetes insipidus." Doc. 274-2, p. 13. Dr. Smith, however, does not opine that water restriction would *never* prevent water intoxication brought on by neurohypophyseal diabetes insipidus, as in Mr. Nunez's case. He only opines that it is not the "treatment of choice."

Thus, Dr. Naranjo's argument fails. Regardless of Mr. Nunez's actual cause of death – in other words, the actual underlying cause of his desire to drink too much water – had Dr. Naranjo reviewed Mr. Nunez's Discharge Summary noting "water intoxication" and taken measures to limit Mr. Nunez's access to water, a fact question exists as to whether Mr. Nunez would have nonetheless died from complications of water intoxication. In turn, that fact question exists regardless of whether the underlying cause of Mr. Nunez's water intoxication was diabetes insipidus (a medical condition) or psychogenic polydipsia (a

---

[14] The Court also rejects Dr. Naranjo's contention that Plaintiffs "fail to accurately recognize Dr. Naranjo's limited role in the care provided to Mr. Nunez." [Doc. 301, p.8]. As already discussed, the scope of Dr. Naranjo's care responsibilities is disputed by the parties, and thus, this fact must be construed in Plaintiffs' favor on summary judgment.

1  psychiatric one). Thus, construing the facts in the light most favorable to Plaintiffs, a jury
2  could reasonably find that Dr. Naranjo's breach of the standard of care, at minimum,
3  contributed to Mr. Nunez's ultimate demise. Dr. Naranjo's motion for summary judgment
4  on the state law negligence and wrongful death claims is **DENIED**.

5  **C. Punitive Damages**

6  In their respective motions, both CPMG and Dr. Hansen additionally urge the Court
7  to grant summary judgment on Plaintiffs' prayer for punitive damages because (1)
8  Plaintiffs' prayer does not comply with California Code of Civil Procedure, Section 425.13,
9  and (2) Plaintiffs cannot establish the requisite intent to recover punitive damages on their
10 state law negligence claim (Count 10). Because CPMG and Dr. Hansen make the same
11 arguments, the Court considers them together.

12 First, CPMG and Dr. Hansen contend that Section 425.13 prevents a pleading that
13 contains a demand for punitive damages without prior court authorization. *See* Cal. Civ.
14 P. Code § 425.13(a) (providing that "no claim for punitive damages shall be included in a
15 complaint [arising out of the professional negligence of a health care provider] . . . unless
16 the court enters an order allowing an amended pleading that includes a claim for punitive
17 damages to be filed."). There is no such court order in this case. However, Section 425.13
18 conflicts with Federal Rule of Civil Procedure 8(a), which requires the pleading to demand
19 the "relief sought, which may include relief in the alternative or different types of relief."
20 Fed. R. Civ. P. 8(a).

21 Although this issue is one of first impression for the Ninth Circuit, the Eleventh
22 Circuit's decision in *Cohen v. Office Depot, Inc.* is persuasive. 184 F.3d 1292 (11th Cir.
23 1999). There, the Eleventh Circuit analyzed a similar state law requiring leave of court to
24 claim punitive damages. *Id.* The Eleventh Circuit found the state law directly conflicted
25 with Rule 8(a)(3), making it inapplicable in federal court. *See id.* Accordingly, the Court
26 follows *Cohen* and holds Section 425.13 does not apply. *See also, Estate of Prasad v. Cty.*
27 *of Sutter*, 958 F. Supp. 2d 1101, 1121 (E.D. Cal. 2013) (holding same).

28

Second, CPMG and Dr. Hansen argue Plaintiffs cannot present sufficient evidence to support punitive damages against them on the negligence claims. California law permits punitive damages where the defendant's conduct is "so vile, base, contemptible, miserable, retched, or loathsome that it would be looked down upon and despised by ordinary decent people," and that such conduct has "the character of outrage frequently associated with crime." *Scott v. Phoenix Schools, Inc.*, 96 Cal. Rptr. 3d 159, 170 (Cal. Ct. App. 2009). "The mere carelessness or ignorance of a defendant does not justify the imposition of punitive damages." *Id.*

Plaintiffs offer the same evidence in support of punitives that they offered in support of their Section 1983 claims. Thus, even construing the facts in Plaintiffs' favor, no reasonable jury could find that Dr. Hansen or CPMG's conduct, however negligent, rose to a level of sufficient "deliberate disregard of the interests of others that [their] conduct may be called willful or wanton." *Id.* Accordingly, summary judgment is **GRANTED** in favor of CPMG and Dr. Hansen on Plaintiffs' prayer for punitives as to their state law negligence claims.

### D. Attorneys' Fees

Dr. Hansen additionally urges the Court to strike Plaintiffs' claim for attorneys' fees because of Cal. Code. Civ. P. § 1033.5(a)(10), which provides that attorneys' fees are allowable costs only when authorized by contract, statute, or law. Plaintiffs respond that multiple statutes permit attorneys' fees in this case, including 42 U.S.C. § 1988 (permitting courts to award attorneys' fees to the prevailing party in any action to enforce a provision of §1983, among others). Because the matter of whether attorneys' fees can be awarded is a premature one at this stage and because it is not adequately briefed by the parties, the Court **DENIES** without prejudice Dr. Hansen's argument, which she may reassert after a

1  final decision on the claims against her.[15]

2  ## IV. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

3       Plaintiffs move for partial summary judgment on Counts 11 and 12 for the Hospital

4  and State's (collectively, "State Defendants") alleged violations of the Americans with

5  Disabilities Act ("ADA") and Rehabilitation Act ("RA"). Doc. 280. The State Defendants

6  also move for summary judgment on those claims.[16] Doc. 268. Accordingly, the Court

7  considers the parties' motions together.

8  ### A. Relevant Facts

9       The following undisputed, properly supported facts are relevant to Plaintiffs' ADA

10  and RA claims. The Hospital's Administrative Directive 15.48 requires a psychiatrist to

11  complete a discharge summary within four working days for all discharged patients. Doc.

12  280-22, p. 13-14. In August of 2015, the Hospital had a *de facto* policy under which

13  psychiatrists did not transmit a discharge summary for patients who were "only temporarily

14  transferred" and not discharged, unless the transferring institution specifically requested a

15

16

17

18

19
_____

20       [15] For example, the parties do not address the availability of attorneys' fees specific
21  to the remaining state law claims against Dr. Hansen. Accordingly, without briefing
     specific to those claims, the Court declines to broadly strike the prayer for attorneys' fees
22  on them.

23       [16] The State Defendants initially urge the Court to strike Plaintiffs' motion as
     "untimely." The facts before this Court do not warrant such action. Plaintiffs filed their
24  motion by the May 18, 2018 deadline, withdrew it on May 23, 2018 because of incorrect
25  exhibit references, and then refiled the corrected version the same day. Plaintiffs did so
     with the permission of Chambers. Further, in their filing, they clearly identified the few
26  revisions made to their exhibit references, as well as filed the revised version of their
     motion within a week of the summary judgment deadline. The Court sees no evidence of
27  prejudice to the State Defendants who could have easily requested an extension of time to
28  file their opposition, but did not. The Court rejects the State Defendants' argument.

3:16-cv-01412-BEN-MDD

discharge summary.[17] [18]  However, as provided by Dr. Fisher's affidavit, if the receiving facility requested a psychiatrist's discharge summary from the Hospital for a transferred patient, the Hospital would then provide one.  Because Mr. Nunez was merely transferred and not discharged, a Hospital psychiatrist did not provide a Discharge Summary for Mr. Nunez.

If a patient was on Clozapine, the Hospital's Nursing Summary Discharge checklist asked that the "Clozapine Data" be completed and submitted with the Discharge Summary. Doc. 280-4, p. 2.  If a patient was diabetic, the checklist asked that the patient's progress be included.  *Id.*  The Hospital did not include a Water Intoxication Protocol with Mr. Nunez's transfer paperwork.

---

[17] The State Defendants fail to dispute this fact by citing Dr. Fisher's Declaration. The cited Declaration does not undermine this fact because it professes a lack of any policies that "*forbid* the preparation and submission of a separate and additional . . . [Discharge Summary] to any receiving facility for a temporarily transferred patient." ¶ 9. The key word, then, is "forbid."  Plaintiffs do not contend a policy exists *forbidding* the inclusion of such documentation.  Rather, they contend a policy exists under which psychiatrists are *required* to complete a Discharge Summary for discharged patients, but not for transferred patients.

[18] The Court additionally rejects as unsupported Defendants' attempt to characterize this fact in a completely different manner.  The State Defendants assert that "[t]he practice at Patton to defer a [Discharge Summary] for any transferred patient until requested by the receiving facility was facially neutral, applying to *all* transferred patients, not just those with water intoxication, or any other disability."  Doc. 285, p. 13.  The State Defendants' citation to Dr. Fisher's Declaration, however, does not support Defendants' statement. Paragraphs 9 and 10 of Dr. Fisher's Declaration do not provide that the Hospital's practice was simply to hold off on submitting a Discharge Summary for transferred patients *until* the receiving facility requested one.  Rather, those paragraphs declare Dr. Fisher's "awareness" that the Hospital would provide such a Discharge Summary *if requested to by the transfer facility*.  Again, these two statements are apples and oranges.  Indeed, in Paragraph 10, Dr. Fisher specifically acknowledges the Hospital's discovery response admitting that a Discharge Summary "is *not* required in such a transfer circumstance." Accordingly, Plaintiffs' fact that the Hospital maintained a de facto policy under which it required a Discharge Summary by a psychiatrist for discharged patients, but not for transferred patients, is undisputed for purposes of the summary judgment motion.

## A. Sovereign Immunity

As a preliminary matter, the State asserts its Eleventh Amendment sovereign immunity bars Plaintiffs' ADA claim. Generally, sovereign immunity under the Eleventh Amendment applies to bar damage suits against the State and its agencies, unless Congress abrogates sovereign immunity through its ability to enforce the substantive provisions of the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 158 (2006). The Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity for conduct that is in itself unconstitutional. *Id.* Therefore, "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159.

Under the framework set out by the Supreme Court in *Georgia*, whether sovereign immunity bars claims under Title II is addressed on a "claim-by-claim basis" and requires assessing "(1) which aspects of the States' alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II, but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.*

First, the Court considers which aspects of the State Defendants' alleged conduct violated Title II and to what extent this misconduct also violated the Fourteenth Amendment. Plaintiffs bring their ADA claim under Title II, which prohibits disability discrimination in the provision of public services. *Weinreich v. L.A. County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). Specifically, Plaintiffs allege the Hospital's policy requiring a doctor's discharge summary for mentally competent patients discharged from the Hospital, but not for mentally incompetent patients who are merely transferring and will return to the Hospital, violates the ADA by providing unequal services to mentally incompetent patients compared to competent ones. In addition, Plaintiffs contend the Hospital's policy of not including a Water Intoxication Protocol in the discharge paperwork

but including protocols for other types of conditions also amounts to dissimilar treatment based on disabled status. As explained in *Georgia*, "the alleged deliberate refusal of prison officials to accommodate [a plaintiff's] disability-related needs in such fundamentals as . . . medical care . . . constitute[s] exclusion from participation in or denial of the benefits of the prison's 'services, programs, or activities.'" *Georgia*, 546 U.S. at 156 (citing 42 U.S.C. § 12132). Because Plaintiffs' Title II claims implicate pretrial detainees' medical care and are based on conduct that allegedly independently violates the Fourteenth Amendment, Congress validly authorized their ADA claims for damages. Accordingly, the Court turns to the merits.

### B. The Merits

Plaintiffs' RA and ADA claims are analyzed in the same way. Although the RA additionally requires that the program or activity receive federal funds, 29 U.S.C. § 794, "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("[C]ourts have applied the same analysis to claims brought under both statutes."). For a claim of disability discrimination under Title II, the plaintiff must show four elements: "(1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was because of the plaintiff's disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

In their first theory, Plaintiffs contend the Hospital discriminated in violation of the ADA and RA because it lacked a policy requiring staff to include a Water Intoxication Protocol with transfer paperwork for its patients diagnosed with psychogenic polydipsia, but the Hospital did have a policy requiring the inclusion of other types of protocols for patients diagnosed with other illnesses. The evidence Plaintiffs offer in support, however,

41

is deficient. Plaintiffs merely cite to the "Nursing Discharge Summary Checklist" completed for Mr. Nunez, which provided that: (1) if a patient was on Clozapine, the "Clozapine Data" was to be completed and submitted with the Discharge Summary, and (2) if a patient was diabetic, the checklist asked that the patient's progress be included. Doc. 280-4, p. 2. These two facts coupled with the fact that the Hospital did not include a Water Intoxication Protocol with Mr. Nunez's transfer paperwork are not enough to establish that similarly situated patients were treated differently because of their disabilities. Thus, Plaintiffs have not satisfied their initial burden of establishing a prima facie case on this theory.

In their second theory, Plaintiffs contend that the Hospital has a de facto policy under which a psychiatrist must draft a Discharge Summary for discharged patients, but not for transferred patients. Thus, the argument goes as follows. Patients are discharged from the Hospital when they are found to be competent to stand trial, making them "able." For those patients who are transferred from the Hospital to another facility, they are scheduled to return to the Hospital because they are still incompetent to stand trial and require further treatment, making them "disabled." Thus, under the Hospital's policy, mentally ill disabled patients who were temporarily transferred to attend court were not entitled to the same discharge paperwork as those patients who were fully discharged to a jail to stand trial based on their restored competency. Accordingly, the Hospital's de facto policy treated able patients differently from disabled patients by providing its able patients with a greater medical "service": a Discharge Summary written by a psychiatrist, rather than a nurse.

The parties do not dispute that Mr. Nunez qualified as an individual with a disability under the ADA and that the Hospital's provision of medical information in a discharge document constitutes a medical "service." In addition, the undisputed facts show that the Hospital's policy was to provide a psychiatrist's Discharge Summary for discharged patients, but not for transferred patients. However, that is where the analysis stops. Although the parties argue at length about the merits of Plaintiffs' theory, Plaintiffs fail to

support that theory with any evidence.  Plaintiffs do not cite to the record to support their contention that discharged patients are discharged when they are found competent and thus are not disabled.  Likewise, Plaintiffs do not cite to the record to support their contention that transferred patients are all mentally incompetent and thus disabled.

Because these material facts are unsupported, the Court is unable to consider them in conjunction with the present motions.  "At the summary judgment stage, a party no longer can rely on allegations alone, however plausible they may be." *Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 768 (9th Cir. 2011).  Rather, "a party opposing summary judgment must present some significant probative evidence tending to support the complaint." *Bias v. Moynihan*, 508 F.3d 1212, 1222 (9th Cir. 2007).  If a plaintiff fails to present any evidence to support a claim, summary judgment in favor of the defendant is appropriate. *Id.*  Here, Plaintiffs have failed to proffer sufficient evidence in support of their ADA and RA claims, either to oppose Defendants' motion or to support Plaintiffs' own motion.  Accordingly, summary judgment is **GRANTED** in favor of the State Defendants and **DENIED** as to Plaintiffs on Counts 11 and 12.

## V.   CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment, Docs. 268, 273, 274, and 275, are **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' motion for partial summary judgment, Doc. 280, is **DENIED**; and Plaintiffs' ex parte motion to exclude, Doc. 291, is **DENIED**.

Specifically, summary judgment is granted on Counts 2 and 4 in favor of Baroi, Ramos, Rucibwa, Oreol, Fisher, and Hansen; on Counts 5 and 6 in favor of Oreol, Fisher, and CPMG; on Counts 9 and 10 in favor of Baroi, Ramos, Rucibwa, Oreol, and Fisher; on Counts 11 and 12 in favor of the State of California and Patton Hospital; and on Plaintiffs' prayer for punitive damages in favor of Hansen and CPMG.

Summary judgment is denied on Counts 2 and 4 as to Naranjo; on Count 3 as moot and without prejudice as to Baroi, Ramos, Rucibwa, Oreol, Fisher, Naranjo, and Hansen;

on Count 9 as to Naranjo and Hansen; on Count 10 as to Naranjo; and on Counts 11 and 12 as to Plaintiffs.

**IT IS SO ORDERED.**

DATED: November 23, 2018

HON. ROGER T. BENITEZ
United States District Judge