UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF RUBEN NUNEZ by and through its successor-in-interest LYDIA NUNEZ, ALBERT NUNEZ, and LYDIA NUNEZ,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al,<br><br>Defendants. | Case No.: 3:16-cv-01412-BEN-MDD<br><br>**ORDER GRANTING PLAINTIFFS' MOTION TO RECONSIDER**<br>**[Doc. 392]** |

Pending before the Court is Plaintiffs' motion to reconsider the Court's summary judgment order as to Defendant Correctional Physicians Medical Group ("CPMG") in light of newly discovered evidence. Because Plaintiffs' newly discovered evidence raises genuine issues of material fact, the motion is GRANTED, and Plaintiffs' claims for failure to train and failure to supervise under 42 U.S.C. § 1983, as well as Plaintiffs' prayer for punitive damages, are hereby reinstated against CPMG.

## BACKGROUND

On January 2, 2019, through pleadings and exhibits filed in another case, *Nishimoto v. County of San Diego, et al.*, 16-cv-01974-BEN-LL, Plaintiffs became aware of various documents that Defendants had not produced, including correspondence between the

County of San Diego and CPMG regarding Mr. Nunez. In response, on January 7, 2019, Plaintiffs moved the Court to vacate under Federal Rule of Civil Procedure 54(b) the portions of its November 5, 2018 summary judgment order, [Doc. 322], which granted CPMG's motion for summary judgment on Counts 5 and 6 and Plaintiffs' prayer for punitive damages. Plaintiffs further requested that the Court refer the motion to the Magistrate Judge for an evidentiary hearing to determine the scope of withheld evidence and to determine what sanctions, if any, were appropriate. Subsequently, Defendant CPMG produced approximately 100 pages of inadvertently withheld discovery.

The Court denied Plaintiffs' motion to vacate but ordered that "Plaintiffs may seek leave to re-assert a motion to vacate later, if substantial relevant evidence is newly discovered." [Doc. 343.] The Court did, however, grant Plaintiffs' request for a referral to the Magistrate Judge, who found the late-produced documents were not withheld willfully or in bad faith. [Doc. 374.] Nonetheless, the Magistrate Judge determined there was time for corrective action and permitted Plaintiffs to depose Dr. Mannis, Dr. Rao, and Dr. Badre about the contents of the newly discovered evidence. [Doc. 374.] Following those depositions, Plaintiffs again move to vacate the Court's summary judgment order as to CPMG, arguing that substantial newly discovered evidence regarding CPMG's failure to train and supervise creates genuine issues of material fact as to Counts 5 and 6 and Plaintiffs' prayer for punitive damages.

## DISCUSSION

In its November 5, 2018 order, the Court granted summary judgment in favor of CPMG on Count 5 for Failure to Train because of a lack of evidence, finding "the connection between CPMG's alleged failure to train and the alleged constitutional violations are both unsupported and are far too tenuous to satisfy the high *Monell* standard." [Doc. 322, p. 31.] As to Count 6 for Failure to Supervise and Discipline, the Court again found Plaintiffs' evidence was "virtually nonexistent" and that Plaintiffs "ma[d]e a variety of unsupported arguments based on assumptions, rather than facts." [*Id.* at 31.] For example, "Plaintiffs rel[ied] on an alleged 'prior incident in which Naranjo failed to enter

information in JIMS and failed to coordinate a patient's care with the nursing staff," but Plaintiffs failed to support that allegation with any evidence. [*Id.*] Regarding Count 10's prayer for punitive damages as to the state law negligence claim, the Court held that based on the minimal evidence offered, no reasonable jury could find CPMG's conduct, "however negligent, rose to a level of sufficient deliberate disregard . . . that their conduct may be called willful or wanton." [*Id.* at 37.] At present, Plaintiffs' Count 10 for negligence is the only remaining claim against CPMG, which is set for a jury trial on June 4, 2019.

**A. Reconsideration Is Warranted**

Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Indeed, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Id.* "A motion for reconsideration may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Life Techs. Corp. v. Illumina, Inc.*, 2012 WL 10933209, at *1 (S.D. Cal. June 11, 2012) (quoting *Kona Enters.*, 229 F.3d at 890)). Moreover, motions to reconsider are not a platform to relitigate arguments and facts previously considered and rejected. *See Harrison v. Sofamor/Danek Grp., Inc.*, 1998 WL 1166044, at *3 (S.D. Cal. Sept. 15, 1998).

This is one of those unusual cases. Here, the Court is satisfied that the evidence proffered by Plaintiffs is newly discovered and could not reasonably have been discovered earlier. CPMG does not argue otherwise. Indeed, Plaintiffs properly requested the late-produced evidence, which was both discoverable and inadvertently withheld until after the Court issued its summary judgment order. The record reflects that Plaintiffs relied upon CPMG's discovery responses that all such evidence had been produced. Thus, the Court cannot find that Plaintiffs reasonably could have known of the evidence earlier.

**B. The Newly Discovered Evidence Raises Genuine Issues of Material Fact**

The Court next evaluates whether Plaintiffs' newly discovered evidence warrants vacating the Court's summary judgment order in favor of CPMG.

1. Evidentiary Objections[1]

The Court considers the parties' evidentiary objections before turning to the undisputed facts. CPMG objects to Dr. Gage's supplemental expert report, arguing (1) it has not been properly authenticated through an affidavit and (2) Dr. Gage's opinion relies upon inadmissible evidence in the form of CPMG's subsequent remedial measures. In response to CPMG's first argument, Plaintiffs submitted Dr. Gage's affidavit to authenticate his supplemental expert report, which is sworn under penalty of perjury and offers information reflecting his competence to offer his expert opinions. [Doc. 401-2.] The Court is satisfied that Plaintiffs' subsequently filed sworn statements adequately remedy the procedural deficiencies of Dr. Gage's report. *See, e.g., Liebling v. Novartis Pharm. Corp.*, 2014 WL 12576619, at *2 (C.D. Cal. Mar. 24, 2014) ("Courts have held, however, that a party can 'cure' the defect of an unsworn expert's report by proffering the sworn deposition or declaration of the expert."). In addition, the Court finds Dr. Gage timely supplemented his expert report, having done so more than 30 days before trial.

Next, CPMG argues Dr. Gage's opinions are inadmissible because they rely upon "subsequent remedial measures," as prohibited by Federal Rule of Evidence 407. In a related argument, CPMG additionally objects to "the majority of" Plaintiffs' newly discovered evidence as constituting inadmissible subsequent remedial measures. [Doc. 398, p. 21.] It is true that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove" either "negligence" or "culpable conduct." Fed. R. Evid. 407. Contrary to

---

[1] As to CPMG's request that the Court take judicial notice of the pleadings and its prior Orders, the request is GRANTED. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 157 (1969) (A court is permitted to take judicial notice of its own court records and files.).

CPMG's argument, however, internal quality assurance discussions and peer review used to determine the necessity of implementing subsequent remedial measures are not, themselves, "subsequent remedial measures" excluded by Fed. R. Evid. 407. Put another way, a defendant's internal investigations and reviews might constitute the initial step toward identifying the need for particular remedial action, but "they are not themselves excluded under Rule 407." *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1103 (D. Or. 2013) ("By its terms, this rule is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what *did* occur.").[2] *Id.* Accordingly, CPMG's objections on these grounds are OVERRULED.[3]

2. <u>Factual Background</u>[4]

The Court assumes familiarity with the facts of this case. On September 4, 2014, CPMG contracted with the County to "provide psychiatric clinical services which include but [were] not limited to initial psychiatric/medical evaluation, diagnosis, treatment, emergency medication orders, medication evaluation and prescription." [Ex. 1 at p. 22.] Dr. Steven Mannis is the sole owner of CPMG. Dr. Nicholas Badre became the "Lead Physician" at the Central Jail one day after completing his residency. Dr. Sanjay Rao was

---

[2] The Court need not address the remaining argument about evidence concerning the removal of a psychiatrist, Dr. B, because it does not rely upon that evidence in this order.

[3] Further, to the extent CPMG again asserts California's peer review privilege, the Court again finds that federal privilege law, not state privilege law, governs here. As Magistrate Judge Dembin held, "[The self-critical analysis privilege] is not recognized by the Ninth Circuit in this context of the instant case . . . State privilege law applies to purely state law claims brought in federal court pursuant to diversity jurisdiction; however, state law claims that are pendent to federal question cases are governed by federal privilege law." [Doc. 189 at p. 7:14-8:16, 9:7-14.]

[4] The factual background is drawn from the relevant admissible evidence submitted by the parties. The Court's reference to certain pieces of evidence is not an indication that it is the only pertinent evidence relied upon or considered. The Court has reviewed and considered all relevant admissible evidence submitted by the parties. Where properly supported disputes of material fact exist, they are construed in the light most favorable to Plaintiffs, as the non-movants on summary judgment.

named the Medical Director of Psychiatry for all CPMG providers. According to CPMG and the County's contract, neither party would supervise the other party's employees, and thus, CPMG was responsible for supervising and training its own employees. [Ex. 1 at 21.] The contract further required CPMG to designate a "Lead Psychiatrist" to "[p]erform Quality Assurance/Quality Inspections (QA/QI) on new residents' charts, as well as performing a quarterly review of charts of all assigned physicians; keep the Sheriff's CMO and/or his designee apprised of QA/QI results." [*Id.* at 24.]

Every month, between 12 and 20 patients were transferred from Patton State Hospital to the Central Jail. In August 2015, Mr. Ruben Nunez, who suffered from serious medical conditions of schizophrenia and psychogenic polydipsia (water intoxication), was one such patient. Mr. Nunez died from these conditions at the Central Jail on August 13, 2015.

Construing the disputed facts in the light most favorable to Plaintiffs, as the non-movants, the following is true about CPMG's training efforts during the time period leading up to Mr. Nunez's death. For new physicians, CPMG conducted an orientation consisting of (1) one day of job shadowing and (2) a packet of orientation information about "correctional psychiatry jargon," general information about the Psychiatric Security Unit ("PSU"), facility security, safety cell clearance, psychiatric sick call, psychotropic medications, and writing orders. [Ex. E.] CPMG did not have a Director of Training. Although Dr. Mannis testified that Dr. Rao was in charge of training and educating CPMG physicians, Dr. Rao did not know this was his responsibility and had not been so informed by Dr. Mannis. Dr. Rao did not know how many employees worked at CPMG in 2015, including whether it was less than 25 or more than 40. During 2015, approximately 30 physicians and four nurse practitioners worked for CPMG.

CPMG's training efforts consisted of (1) disseminating educational information to physicians on an "as needed" basis, as determined by Drs. Mannis, Rao, and Badre and (2) holding "journal club meetings" approximately twice a year for providers to meet and discuss any issues, review procedures, and assess how practices could be improved, among

other topics. CPMG providers were encouraged but not required to attend the journal club meetings. Dr. Rao could not recall if there had been even one journal club meeting in 2015.

As for its supervision efforts, CPMG did not conduct a single performance review of its providers. Dr. Rao, the individual in charge of conducting chart reviews, did not counsel any individual providers and could not identify any doctor with whom he spoke about a deficiency in the charts. Although Dr. Rao conducted at least some audits of psychiatric provider charts, he did not believe any CPMG doctor ever received a copy of his reviews. Dr. Rao could not identify any physicians who received retraining. CPMG did not conduct any formal in-person reviews of its physicians. Dr. Naranjo testified that he was never audited or received a performance review and had never seen any audits or reviews of his performance. Dr. Badre recommended the termination of one provider for poor documentation accompanied with poor response to feedback given. Howeve, prior to Mr. Nunez's death, Dr. Mannis did not terminate the contracts of any CPMG providers for poor performance.

At the Central Jail, the Psychiatric Security Unit ("PSU") functions to treat mentally ill patients who need hospitalization, and in the PSU, jail staff are permitted to administer medication involuntarily to patients. Importantly, the PSU is also the only location in the Central Jail where psychiatric patients' water intake can be regulated. At the beginning of the parties' contractual relationship in November 2014, Dr. Alfred Joshua, Chief Medical Officer for the Sheriff's Department, emailed CPMG regarding various action items, including noting that the policy on admissions to the PSU would be drafted by December 15, 2014. He summarized the policy on "Admission into PSU" as providing that Nurse Practitioners could not admit patients to the PSU; only a psychiatrist could ultimately evaluate and admit inmate-patients into the PSU. [Ex. 5, p. 1.] Likewise, Dr. Mannis, CPMG's owner, understood that it was psychiatrists who ultimately evaluated and admitted patients to the PSU. When Mr. Nunez was transferred to the Central Jail, Patton State Hospital sent along the court order authorizing "San Diego County Jail's Psychiatric Security Unit and Patton State Hospital to involuntarily administer antipsychotic

medication" to Mr. Nunez. [Ex. 3 at 5.]  Mr. Nunez, however, was not placed in the PSU and had unrestricted access to water.

Dr. Sara Hansen, a CPMG psychiatrist, knew Mr. Nunez's water needed to be restricted.  CPMG did not train Dr. Hansen that, to restrict a patient's water, she had to order his placement in the PSU.  Similarly, Dr. Badre did not receive training on where patients' water could be restricted.  Dr. Badre also did not know physicians were responsible for housing determinations and testified that CPMG staff could not affect housing.  Dr. Rao, in charge of CPMG's training and supervision, did not understand the process for admitting an inmate patient who had been transferred from a state hospital.

Dr. Joshua testified that Dr. Jorge Naranjo was the psychiatrist responsible for inmates coming from state hospitals and was in charge of the PSU.  He also testified that the initial psychiatrist who evaluated an incoming inmate would determine where that inmate was housed.  Dr. Naranjo, however, testified that he had nothing to do with housing determinations and did not have the authority to decide whether patients were admitted into the PSU or the psychiatric floor.  Further, Dr. Naranjo testified that he would not review a new inmate-patient's chart and would only review the medication list.  Similarly, Dr. Hansen testified that she had a habit of not reviewing the nurse's discharge summary for transferred patients.  She did not review Mr. Nunez's record from the Central Jail where a Jail nurse noted that she told Mr. Nunez "to drink plenty of water."

After Mr. Nunez's death, Drs. Badre and Rao found Dr. Hansen failed to properly document Mr. Nunez's medical history, failed to request reasonable follow up, and did not document an alert for water restriction in the Jail's computerized medical record system ("JIMS") for Mr. Nunez.  Prior to Mr. Nunez's death, Dr. Mannis knew some providers had difficulty with JIMS.  Dr. Hansen testified she did not know how to use JIMS medical alerts.  Meanwhile, Dr. Rao, who was in charge of training CPMG providers, believed CPMG physicians were not responsible for updating a patient's medical alerts in JIMS.  Similarly, Dr. Badre testified he had never been trained on how to use the JIMS alerts.

### 3. Failure to Train and Supervise Claims

For purposes of Plaintiffs' § 1983 claims for failure to train and failure to supervise, private entities like CPMG are treated like municipalities under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012). "Under *Monell*, [CPMG] can be held liable under § 1983 for policies of inaction as well as policies of action." *Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014). Because neither state officials nor municipalities are vicariously liable for their employees' deprivations of others' constitutional rights, *Flores v. City of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (citing *Monell*, 436 U.S. at 694)), it is also true that, under § 1983, CPMG cannot be held liable under a *respondeat superior* theory.[5] Rather, to bring *Monell* claims against CPMG based on CPMG's alleged failure to train and supervise its employees, Plaintiffs must show (1) CPMG acted under color of state law,[6] (2) CPMG's training and/or supervision policies were not adequate to prevent violations of law by its employees and/or were not adequate to train its employees to handle the usual and recurring situations with which they must deal, (3) CPMG was deliberately indifferent to the substantial risk its policies were inadequate, and (4) CPMG's failure to provide adequate training and/or supervision was so closely related to the deprivation of Mr. Nunez's rights as to be the moving force that caused his death. *See, e.g.,* Ninth Cir. Model Jury Instruction 9.8; *see also, e.g., Kirkpatrick v. County of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016).

Plaintiffs argue their newly discovered evidence shows the following training and supervision failures by CPMG: (1) failure to train physicians to understand that they, alone, could order patients to be housed in the PSU; (2) failure to train physicians on the

---

[5] Despite Plaintiffs' repeated reliance on *Starr v. Baca*, 652 F.3d 1202 (2011), CPMG cannot be held liable under a supervisory liability theory because Plaintiffs do not individually name any CPMG supervisors as defendants. *Cf. Starr*, 652 F.3d at 1207-1208 (considering defendant Sheriff Baca's supervisory liability under § 1983 and *Monell* where Baca was a supervisor who plaintiff sued in his *individual capacity*).

[6] As before, the parties do not dispute this element. [Doc. 322, p. 30.]

Department of State Hospitals terminology; (3) failure to train physicians on how to communicate critical medical information through the Central Jail's computerized system, JIMS; (4) failure to train physicians to read patients' medical records and discharge summaries; (5) failure to train physicians on where water can be restricted and monitored; (6) failure to conduct quality assurance by reviewing its physicians' performance; and (7) failure to take corrective action when deficiencies were found. [Doc. 389, p. 22.]

In opposition, CPMG argues the Court's summary judgment order must stand because despite Plaintiffs' new evidence, a reasonable jury could not find CPMG's alleged failures to train and supervise amounted to "deliberate indifference" or that they caused Mr. Nunez's death. For the following reasons, the Court finds Plaintiffs have carried their burden to raise a triable issue as to both elements, defeating CPMG's motion for summary judgment.

*a. Plaintiffs Raise a Triable Issue of Fact as to CPMG's Deliberate Indifference*

First, CPMG argues that Plaintiffs' § 1983 claims must fail because they do not offer evidence of a *pattern* of constitutional violations similar to the one Mr. Nunez experienced. To show deliberate indifference supporting a failure to train claim, Plaintiffs must offer evidence showing CPMG "disregarded a known or obvious consequence . . . that a particular omission in [its] training program [or lack of supervision] [would] cause[] [CPMG] employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51 (2011). As Defendants correctly argue, a "pattern of similar constitutional violations by untrained employees is *ordinarily necessary* to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (emphasis added). The Supreme Court further explained:

> Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Id.* at 62.

Although Plaintiffs do not offer evidence showing a pattern, the analysis does not end there. [Doc. 401 at 4.] The Supreme Court also "left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 at n.10 (1989)). For instance, a plaintiff may succeed in proving a failure to train claim without showing a pattern where "a violation of federal rights may be a highly predictable consequence of a failure to equip [the employees] with specific tools to handle recurring situations." *Bd. of Cnty. Commissioners v. Brown*, 520 U.S. 397, 409 (1997).

As an example of such "a narrow range of circumstances," the Supreme Court offered the hypothetical of a city that deploys its police force with firearms into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Id.* In its hypothetical, the Court "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* The Court explained that its hypothetical recognized "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints of the use of deadly force." *Id.*

Here, the Court is persuaded that a reasonable jury could find Plaintiffs' failure to train and supervise claims fall within the narrow range of circumstances sufficient to support a deliberate indifference finding. First, Plaintiffs' evidence suggests more than a missing policy or a lack of training specific to a unique situation. Instead, Plaintiffs' evidence suggests that CPMG's training and supervision efforts were so minimal that their inadequacy would have been patently obvious to CPMG. Moreover, the circumstances surrounding Mr. Nunez's transfer to and need for increased monitoring at the Central Jail

were not unusual in several respects.[7] It is undisputed that inmate-patients transferred from state hospitals to the Central Jail generally require medical alerts in the JIMS system and housing in the PSU.  It is also undisputed that between 12 and 20 of those state hospital patients are transferred to the Central Jail every month.  In other words, Mr. Nunez's transfer from a state mental hospital to the Central Jail was not a unique circumstance; it was a "recurring situation."  *Bd. of Cnty. Commissioners v. Brown*, 520 U.S. 397, 409 (1997). Where not one CPMG individual accepts responsibility for training CPMG's providers and where multiple providers, including CPMG *directors*, have no understanding that only psychiatrists can place transferred inmate-patients in the PSU, Plaintiffs have raised a triable issue on whether Mr. Nunez's death was "a highly predictable consequence of fail[ing] to equip [CPMG providers] with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409.  The "highly predictable consequence" of failing to equip CPMG doctors with knowledge about how to place critically ill patients in the PSU or that it was their responsibility to order transferred patients' housing in the PSU, is that critically ill transferred patients *would not* be placed in the PSU and *would not* receive the level of psychiatric care and monitoring required by the U.S. Constitution.

Moreover, much like the Supreme Court's hypothetical in *Canton*, there is no reason to assume that CPMG physicians would innately know—without CPMG's training—that it was their responsibility to place patients into the PSU, how to place patients in the PSU, or how to communicate critical medical alerts about patients through the Central Jail's computerized system.  Cf. *Flores v. Cnty of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014) (without pattern of similar constitutional violations, "[t]here [wa]s no basis from which to conclude that the unconstitutional consequences of failing to train police officers

---

[7] To be sure, Mr. Nunez's need for a cell with water restrictions appears to be an unusual circumstance.  Without a pattern of similar violations, however, the Court cannot find CPMG's failure to train its providers on how to *restrict patients' water* rises to the level of deliberate indifference under *Monell*.  Nonetheless, the other circumstances surrounding Mr. Nunez's treatment at the Central Jail are *not* unusual.

not to commit sexual assault are so patently obvious that the [defendants] were deliberately indifferent" where "[t]here [wa]s . . . every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is presumed to know the law."). This is particularly so within the overall context of CPMG's training efforts. Plaintiffs offer evidence depicting CPMG's training process as both ineffective and virtually nonexistent. With only a single day of job shadowing and an orientation packet that did not address the PSU housing placement process, CPMG physicians managed the medical and psychological needs of a complex population, including transferred inmate-patients so mentally ill that they were not competent to stand trial and often required additional medical care in the PSU. At the same time, there was organization-wide confusion about who oversaw the training and supervision of CPMG physicians and whose responsibility it was to order a patient's placement in the PSU. Indeed, Dr. Naranjo, the very physician in charge of both CPMG's psychiatric unit and the initial evaluation and placement of all transferred patients, did not know he could order a housing placement in the PSU and believed his role was limited to reviewing a patient's medication list. At minimum, the new evidence raises a triable issue as to whether CPMG's training failures were "so patently obvious that [CPMG] w[as] deliberately indifferent."

CPMG responds by arguing that its "journal club meetings" covered the majority of CPMG's training needs. The evidence also shows, however, that these journal club meetings were held approximately twice a year and were voluntary, not mandatory. Dr. Rao, the individual tasked with training and supervising all CPMG providers, could not recall if he conducted even one of those journal club meetings in the year prior to Mr. Nunez's death. In essence, the new evidence raises a genuine issue as to whether CPMG's training was so inadequate that a jury could reasonably find deliberate indifference.

The Court is similarly not persuaded by CPMG's contention that it had no notice of Dr. Hansen and Dr. Naranjo's training deficiencies and continuity of care problems. The new evidence raises a genuine issue upon which a reasonable jury could find that CPMG chose not to know about Dr. Hansen and Dr. Naranjo's training needs because it chose not

to implement a systematic and regular auditing system to monitor the performance of its 30 physicians. Prior to Mr. Nunez's death, CPMG neglected to review the performance of either Dr. Naranjo, who was in charge of the psychiatric unit, or Dr. Hansen. Indeed, CPMG did not audit either provider's charting practices even once.

Further, the new evidence suggests deliberate indifference by CPMG and that deliberate indifference may have caused Mr. Nunez's death. For example, a review of both physicians' practices reflected serious deficiencies that CPMG likely would have identified had it conducted regular reviews of its physicians' charting or practices. Dr. Naranjo testified he never reviewed patients' charts and would only review their medication lists, despite other testimony that Dr. Naranjo was responsible for all inmates transferred from state hospitals. Similarly, Dr. Hansen testified that she did not review nurse discharge summaries for transferred patients. Had CPMG audited Dr. Hansen and Dr. Naranjo's charts, it may have learned that neither doctor was placing critically ill patients into the PSU for needed treatment and neither doctor was writing treatment plans or coordinating continuity of care. Thus, the Court finds Plaintiffs' new evidence "raises more than a spectre of deliberate indifference" by CPMG. *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 796 (9th Cir. 2016) (denying summary judgment on plaintiff's failure to train claim, despite lack of evidence showing pattern of similar constitutional violations, where evidence showed a complete failure by agency to train its social workers on the procedures for obtaining a warrant and when a warrant is required before taking a child from a parent).

Despite the many challenges posed to CPMG physicians at the Central Jail, including having to manage the psychological needs of inmate-patients coming and going from state hospitals within a complicated corrections facility environment, Plaintiffs' new evidence further suggests that CPMG's supervision efforts were constitutionally inadequate. The new evidence raises genuine issues as to whether CPMG formally reviewed a single physician, provided audits to its physicians, or had a methodical system for conducting audits of its physicians' charting and treatment practices. In light of the newly discovered evidence, a reasonable jury could find that had CPMG conducted even

the most basic of oversight, it would have conducted additional training after (1) recognizing its physicians lacked an understanding of the housing placement process for patients so vulnerable that they required admission to the PSU, and (2) recognizing its physicians lacked an understanding of how to use the medical alerts in the Central Jail's electronic system.  Put another way, a jury could reasonably find that the need for additional training and supervision was "so patently obvious" that serious risks to patients' medical care was the likely consequence.  Plaintiffs have carried their burden to raise a triable issue as to whether CPMG's alleged failures amounted to deliberate indifference.

   b. *Plaintiffs Raise a Triable Issue of Fact as to Causation*

  CPMG acknowledges the widespread confusion about how to place patients in the PSU.  Still, CPMG contends that Plaintiffs cannot show causation because, even if Mr. Nunez had been admitted to the PSU, he still would have had access to water, unless a provider ordered water restriction. [Doc. 398, p. 25.] CPMG further argues that Plaintiffs' argument about the need for training on PSU housing placement "presupposes that Dr. Naranjo and Dr. Hansen understood they were responsible for monitoring Mr. Nunez's medical conditions and knew Mr. Nunez needed immediate water restriction." *Id.* CPMG's theory is not persuasive, particularly because it evinces the inadequacy of CPMG's training: why did neither Dr. Naranjo nor Dr. Hansen know they were responsible for monitoring Mr. Nunez's medical conditions?  Moreover, the evidence shows that patients in the PSU were subject to greater monitoring, and thus, a fact question exists as to whether PSU staff would have been more likely to notice and react to Mr. Nunez's dire condition before it was too late.  Accordingly, Plaintiffs' new evidence raises a triable issue on causation—whether CPMG's training and/or supervision failures were so closely related to the deliberate indifference to Mr. Nunez's serious medical needs as to be the moving force that caused his death.

  4. <u>Punitive Damages</u>

  In its summary judgment order, the Court found that no reasonable jury could find CPMG's conduct rose to the level of "deliberate disregard of the interests of others that

[its] conduct may be called willful and wanton." [Doc. 322, p. 37.]  For the same reasons that Plaintiffs' newly discovered evidence raises genuine issues of material fact as to CPMG's deliberate indifference, Plaintiffs have likewise raised genuine issues of material fact as to the appropriateness of punitive damages.  Based on the record, a reasonable jury could find CPMG's recklessness in failing to train and/or supervise its providers rose to a level of deliberate disregard sufficient to support punitive damages.

## CONCLUSION

For the previous reasons, Plaintiffs' motion is **GRANTED**.  It is further ordered that the parties re-submit their proposed joint pretrial order and their proposed jury instructions to include Counts 5 and 6 and punitive damages against CPMG within **7 days** of this order.  As before, the parties' proposed jury instructions must comply with the Court's prior order as to format, and the parties are ordered to again meet and confer about the additional jury instructions before submitting them to the Court.

**IT IS SO ORDERED.**

DATED: May 17, 2019

HON. ROGER T. BENITEZ
United States District Judge